## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-KA-01452-SCT

*LOUIS CLAY a/k/a LOUIS CLAY, JR. a/k/a 'SPOOLA BOO'*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/17/1997 |
| TRIAL JUDGE: | HON. LILLIE BLACKMON SANDERS |
| COURT FROM WHICH APPEALED: | WILKINSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT J. HILDUM |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT S. FLYNN |
| DISTRICT ATTORNEY: | RONNIE LEE HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 3/23/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/13/2000 |

## BEFORE PITTMAN AND BANKS, P.JJ., AND MILLS, J.

## PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. This is a criminal appeal taken from the Circuit Court of Wilkinson County, Mississippi, Circuit Judge Lillie Blackmon Sanders, presiding, wherein Louis Clay, Jr. was convicted of aggravated assault and sentenced as an habitual offender to twenty years in the custody of the Mississippi Department of Corrections without benefit of probation or parole. Final judgment was entered on October 17, 1997, and this appeal was timely filed.

### STATEMENT OF THE FACTS

¶2. On November 8, 1996, Louis Clay, Jr., was indicted on the charges of assault with a deadly weapon and a convicted felon in possession of a firearm. The indictment also noted that Clay was an habitual offender.

¶3. On December 2, 1996, Clay appeared before Circuit Judge Lillie Blackmon Sanders in the Circuit Court of Wilkinson County for arraignment. Clay pled not guilty. Judge Sanders found Clay to be indigent and appointed Thomas Rosenblatt to represent Clay. Citing an unwillingness by Clay to defer and cooperate with counsel, Rosenblatt filed a motion to withdraw as Clay's attorney, which was granted. L. H. Rosenthal was then appointed as Clay's counsel, and trial was set for February 27, 1997. Rosenthal sought

and was granted a continuance, giving him more time to prepare for trial due to his recent appointment to the case.

¶4. Trial was set for June 17, 1997. On June 16, Rosenthal sought and was granted a continuance based upon Clay's impending surgery with a new trial date set for June 26, 1997. Although not reflected in the record, the trial was apparently continued again on June 26, 1997. On September 19 trial was reset for October 8, 1997.

¶5. Jury selection began on October 8, 1997, but a mistrial was declared prior to the jury being selected. Trial was reset for October 16, 1997. On the date of trial an extensive conference was held in chambers. During the conference, Clay requested that he be allowed to present pro se motions. During the course of discussion, the court discovered that Clay and Rosenthal disagreed on how Clay was to be represented. Rosenthal then made an oral motion to withdraw as Clay's counsel citing a differing opinion on how to proceed with the case and questioning Clay's indigent status.

¶6. Clay responded to Rosenthal's allegation concerning certain assets and pointed out that Clay received food stamps and disability benefits, citing a monthly income of $484. Subsequently, the court granted Rosenthal's motion to withdraw and revoked Clay's indigent status based upon his statement that he made $484 per month from disability. A discussion then ensued concerning the prior delays in going to trial. The State blamed the delays on Clay and accused him of intentionally delaying the proceedings. The State also petitioned the court to raise Clay's bond. Rosenthal stated that delay alone was not his purpose for seeking another continuance. Before Rosenthal could explain his reason for the continuance, Judge Sanders cut him off, reminding him that he had been excused from representing Clay. The discussion of prior delays continued with the State seeking once again to have Clay's bond raised, theorizing that Clay was manipulating the system through undue delays.

¶7. Conversation then turned to the issue of Judge Sanders's ability to be fair and unbiased. The discussion ended when Judge Sanders once again found Clay not indigent, granted a recess in which time Clay could hire a new attorney, and raised his bond from $20,000 to $100,000 so the case would not "drag on and on and on."

¶8. Clay stated that he could not make the bail and requested that he be given "a couple of days" to find an attorney since he had already talked to one about taking his case. Judge Sanders reiterated that Clay's bail was set at $100,000 and explained that his new attorney could talk to him in jail. Faced with the prospect of going to jail during the interim before trial and after talking with Rosenthal, Clay decided to proceed pro se that day.

¶9. Judge Sanders then conducted an examination of Clay under URCCC 8.05 to determine whether he knowingly and voluntarily desired to proceed as his own attorney. After the examination and further discussion with Rosenthal, Clay decided to represent himself at trial that day. For the record, Judge Sanders found that Clay knowingly and voluntarily decided to proceed as his own attorney. Judge Sanders, in her discretion, further decided not to appoint, at that time, an attorney to assist Clay in matters of procedure and protocol. Clay suggested that he might need an attorney later, at which point the State argued that such an appointment at a later time would once again delay the trial. Judge Sanders responded that Clay could acquire an attorney to advice him at the beginning of trial. Clay said he intended to get an attorney but wanted to get started.

¶10. Jury selection then began. At some point during voir dire, one of Clay's witnesses (also his common-law wife) entered the courtroom with her baby. Clay wanted to speak with her, but the court sustained the State's objection to communication between Clay and the witness during voir dire. Judge Sanders informed Clay that he could talk to his witness but not about the case.

¶11. After a two-day trial, the jury returned a guilty verdict. After excusing the jury, the Court, at the request of the State, conducted an habitual offender hearing. The State introduced documentation from the Circuit Clerk's Office evidencing prior convictions. Clay was then sentenced to twenty years in prison as an habitual offender.

## STATEMENT OF THE ISSUES

**I. WHETHER CLAY WAS DENIED HIS DUE PROCESS RIGHTS WHEN ON THE DAY OF TRIAL THE COURT STRIPPED CLAY OF HIS INDIGENT STATUS AND ALLOWED HIS ATTORNEY TO WITHDRAW.**

**II. WHETHER CLAY'S DECISION TO PROCEED PRO SE WAS FREE AND VOLUNTARY WHERE AS A RESULT OF THE TRIAL COURT'S RULINGS CLAY WAS FACED WITH THE CHOICE OF GOING TO TRIAL WITHOUT COUNSEL OR GOING TO JAIL.**

## DISCUSSION

**I. WHETHER CLAY WAS DENIED HIS DUE PROCESS RIGHTS WHEN ON THE DAY OF TRIAL THE COURT STRIPPED CLAY OF HIS INDIGENT STATUS AND ALLOWED HIS ATTORNEY TO WITHDRAW.**

**II. WHETHER CLAY'S DECISION TO PROCEED PRO SE WAS FREE AND VOLUNTARY WHERE AS A RESULT OF THE TRIAL COURT'S RULINGS CLAY WAS FACED WITH THE CHOICE OF GOING TO TRIAL WITHOUT COUNSEL OR GOING TO JAIL.**

¶12. Issues I and II shall be considered together for the purpose of determining whether stripping Clay of his indigent status and raising his bail served to make his choice to proceed pro se non-voluntary and to infringe his right to effective assistance of counsel. Both the determination of indigent status and the setting of bail are left to the sound discretion of the trial judge. *Gerrard v. State*, 619 So.2d 212, 218 (Miss. 1993); *Lee v. Lawson*, 375 So.2d 1019, 1021 (Miss. 1979). Such judgment shall not be overturned unless there is a showing of manifest error or abuse of discretion. *Id.* at 1021.

¶13. The record reflects that Clay was examined and declared indigent on December 3, 1996, by Judge Sanders and an attorney was appointed for his defense. The record does not show upon what basis this decision was made, nor are there any affidavits or statements attesting to Clay's status as an indigent.

¶14. On October 16, 1997, the day of trial, Clay sought a continuance and the dismissal of his attorney, Rosenthal. After such motion had been read into the record, Rosenthal claimed that Clay was not indigent. He based this opinion upon certain property he had seen at Clay's home over the course of his representation of Clay. These assets as described by Rosenthal were cars, office equipment and interest in a club. Rosenthal, however, did not provide any evidence that such property belonged to Clay nor did he

provide an affidavit for the record as directed by Judge Sanders.

¶15. When questioned about these alleged assets Clay explained that the cars were not his and were not located at his address but were located at the address of his common-law wife, Yolanda Davis. He explained that his common-law wife owned four, that his son owned one, and that another belonged to a friend, Joseph Pyle, for whom Clay "had some guys working on it." Clay further explained that the office equipment belonged to his sister who owned a beauty shop in Baton Rouge which had burned, and she was storing the equipment with him. Clay did not address his alleged interest in a social club, but Rosenthal admitted that the club was titled in the name of Clay's son. Clay admitted to receiving $480 in disability and food stamps. He had admitted to this income at his first examination concerning whether he was indigent.

¶16. Based upon Rosenthal's opinion regarding Clay's assets and Clay's income of $480 per month from disability and food stamps, Judge Sanders stripped Clay of his indigent status. Judge Sanders also granted Rosenthal's motion to withdraw as Clay's counsel.

¶17. While the determination of indigent status is left to the sound discretion of the judge and no law requires that an evidentiary hearing be held to determine such, the decision must not be an abuse of that discretion. *See generally **Bilbo v. Thigpen***, 647 So.2d 678 (Miss. 1994). This Court finds that Judge Sanders abused her discretion in stripping Clay of his indigent status under the facts of this case.

¶18. Supporting this decision are several factors: First, Clay had previously been examined and declared indigent by Judge Sanders with the knowledge that Clay received a monthly income of $480. Second, the opinion of Rosenthal, without more, is nothing more than opinion. He did not make a sworn affidavit, and one is not in this record. Furthermore, Rosenthal's opinions as to Clay's assets were speculative and not well developed. Clay adequately responded to the accusations. Third, Judge Sanders should not have relied upon the mere opinion of a single person in revoking Clay's indigent status after she had previously examined him and found him to be indigent. Lastly, Judge Sanders evinced a bias toward Clay because of the delays in going to trial. Such bias is represented by the following statements made immediately after Clay provided an explanation to Rosenthal's opinions: "The Court is of the opinion that you are doing everything in your power to prevent having a trial. That you are delaying this matter. And all of these are tactics." Subsequently, Judge Sanders allowed Rosenthal to withdraw and stripped Clay of his indigent status. Judge Sanders abused her discretion in revoking Clay's indigent status.

¶19. It should be noted that the State mentions in its brief the fact that Clay had been in touch with another attorney, John Horne, just prior to the withdrawal of Rosenthal. The State asks the question how Clay could retain another lawyer if he was indigent. There is no evidence to suggest that Clay could afford to pay Horne. In fact, Clay proceeded with the trial pro se, without the assistance of an attorney. Neither does the fact that Clay is now represented by counsel evidence that he was not indigent on the day of trial.

¶20. The revocation of Clay's indigent status should not be examined alone. The raising of Clay's bond from $20,000 to $100,000 should also be considered in the context of Clay proceeding to trial pro se and his right to effective counsel. While this Court has maintained that the setting of bail is within the trial court's discretion, this Court has espoused factors which should be considered as guidelines when determining the amount of bail. They are here set forth:

    1) Defendant's length of residence in the community;

2) His employment status and history and his financial condition;

3) His family ties and relationships;

4) His reputation, character and mental condition;

5) His prior criminal record, including any record of prior release on recognizance or on bail;

6) The identity of responsible members of the community who would vouch for defendant's reliability;

7) The nature of the offense charge and the apparent probability of conviction and the likely sentence, insofar as these factors are relevant to the risk of non-appearance; and

8) Any other factors indicating the defendant's ties to the community or bearing on the risk of willful failure to appear.

*Shook v. State*, 511 So.2d 1386, 1387 (Miss. 1987). The record clearly reveals that Judge Sanders considered none of these guidelines when she determined to raise Clay's bail. The only reason stated for raising the bail was that Judge Sanders did not want the case to "drag on and on and on." Judge Sanders got her wish. Clay proceeded to trial that day as a pro se defendant and was convicted after a two-day trial.

¶21. The purpose of bail is to secure the presence of the accused at trial, not necessarily to expedite the judicial process. *Lee*, 375 So.2d at 1021. Judging from the record, Judge Sanders had nothing more on her mind than seeing that the case experienced no more continuances, whether or not Clay was responsible for such delays. "The constitutional right to bail before conviction. . . has become so fundamental that it is favored by the public policy of this state." *Id.* Where excessive bail is required it is tantamount to a denial of bail which is in direct contradiction to [Article 3, Section 29 of the Mississippi Constitution](). *Brown v. State*, 217 So.2d 521, 523 (Miss. 1969). Clay repeatedly informed Judge Sanders that he could not afford $100,000 bail. His decision to proceed pro se is evidence of his sincerity. Where Judge Sanders abused her discretion in revoking Clay's indigent status without proper reasons and in setting excessive bail beyond the means of an indigent Clay without the appropriate rationale, Judge Sanders committed reversible error, essentially forcing Clay to go to trial pro se without the effective assistance of counsel.

¶22. The examination conducted by Judge Sanders under [URCCC 8.05]() to determine whether Clay knowingly and voluntarily proceeded to trial pro se does not cure her prior abuses of discretion because it was precisely those abuses of judicial discretion which led to Clay's decision to proceed to trial that day as a pro se defendant. Faced with the prospect of going to trial pro se or going to jail until he could raise the money to hire an attorney, Clay "chose" to go to trial. It is not this Court's ruling that any time a defendant chooses to proceed pro se in the face of a denial of bail that they do so involuntarily. Under these facts, however, Clay should not have had to confront his fears about going to jail. For Clay, there was no choice.

¶23. One might wonder why Judge Sanders was so abrupt with Clay. The record reflects that the delays in the case weighed heavily upon her. The record, however, indicates further bias by Judge Sanders toward Clay. The record indicates that Clay made a pro se motion which claimed that Judge Sanders was biased against Clay, and he sought her recusal. In the record, Judge Sanders and Clay discuss a letter from Clay to Rosenblatt, Clay's first attorney, in which Clay asks Rosenblatt to seek the recusal of Judge Sanders for past statements she made evidencing bias against Clay. Apparently, Rosenblatt withdrew from

representation over the matter and never discussed the issue with Judge Sanders. During a discourse on the record, however, the gist of the letter was discussed:

THE COURT: Would you make the statement what this Court, what Lillie Blackmon Sanders has done that you feel would be prejudicial to you as a defendant in this case, things that I have done.

MR. CLAY: The thing that I wanted to file before -- Mr. Rosenblatt, when you appointed him, I was at arraignments here in Wilkinson County. And, anyway, you had stated could I afford an attorney, so I told you I couldn't afford an attorney. And you said, "how much money do you make," and I told you $484.00. So you said, "well you can pay an attorney out of that money". I said, "well where am I going to stay at. I have kids and I have a house," you know, "I have to pay rent and stuff". So then you made the statement that Mississippi offered free housing. And I said, "well I didn't know nothing about that". I said, "where that's at". So you told me Parchman Prison. So that intimidated me. I felt that you was telling me, you know, you would lock me up in the pen or something, you know. You would send me to the pen. That was my impression.

THE COURT: I believe that statement was made at your arraignment.

MR. CLAY: Yes, ma'am.

THE COURT: So how did that prejudice your case in terms of --

MR. CLAY: Well I figured, you know -- like I say, I'm just thinking -- I just figured you would go against me, you know. Wouldn't give me a fair trial.

After this discourse, Judge Sanders informed Clay at length that she was not biased or unfair and that she would not be manipulated by Clay or any defendant. As proof of her fair mindedness she offered this insight:

THE COURT: This Court does not go against anybody. Let me just say this on the record: if I had wanted to be unfair to you, or if I had wanted to -- and the Court had every prerogative to do that. Last week, the top of the jury had mostly white jurors on it. And it was totally my call as to whether or not I would start at the top of the list, or whether I would start at the bottom of the list so that you could have a majority African-American jury. The Court started at the bottom of the list, because my rule, and I do not change them regardless of who the defendant is or what the situation is, is that the first day I empanel the jury, I start at the top, and the second day, I start at the bottom.

We do not know which day this occurred or why she started where she did in selecting a jury. Immediately following her lengthy discussion concerning her ability to be fair, Judge Sanders repeated that she was revoking Clay's indigent status and promptly ruled that she was increasing Clay's bond.

¶24. The record reflects that Clay actually perceived a hostile attitude by Judge Sanders toward him:

MR. CLAY: Judge Sanders, I also --

THE COURT: And would you state on the record what statements this Court has made that are prejudicial to you, or that leads you to believe that I cannot be a fair judge on your case.

MR. CLAY: Judge Sanders, I don't mind talking, but it seems like I'm just making people mad up in

here.

> THE COURT: No, if you have a legitimate reason. We have another judge in this district, so I don't have to be the judge on your case.

The previous discussions clearly reveal that Judge Sanders has a propensity for bias and exhibited such toward Clay as revealed by her words and her actions in abusing her judicial discretion with regard to Clay's indigent status and the setting of bail.

¶25. This bias extended to the trial as well. Although not addressed by Clay, warnings given by Judge Sanders to Yolanda Davis (Clay's only defense witness) on cross-examination concerning perjury show further judicial bias and indiscretion. The following exchange took place between Judge Sanders and Davis:

> Q. On the second trip. It's your testimony, under oath, that on the afternoon of October 15th, 1996, after 2 p.m., did you see Reginald Todd McGhee on the property out there at Jackson-Lousiana --

> THE COURT: Before you answer that question, the Court feels compelled to --

> A. I seen --

> THE COURT: Before you answer that question, the Court feels compelled to remind you that you're under oath. And that the penalty for lying under oath, the crime is called perjury.

> MS. DAVIS: Excuse me?

> THE COURT: No, don't excuse me. You excuse me.

> MS. DAVIS: I mean, I can understand what he's saying. But --

> THE COURT: When the Court's speaking to you, you listen.

> MR. CLAY: Just be quiet, Yolanda.

> MS. DAVIS: I'm sorry.

> THE COURT: Thank you. And I feel compelled. Because as the Court, I'm here duty bound to explain to you that the penalty for lying under oath is ten years. That's the maximum sentence for perjury, before you answer his question. I'm going to go even further and tell you that I believe that -- excuse me -- the answer to your question, that it can be proven.

It appears from this exchange that Judge Sanders told the witness that she believed Davis's answer would constitute perjury. This exchange took place in front of the jury. Such commentary on Davis's testimony was undeniably prejudicial to both Davis's testimony and Clay's defense. Such judicial conduct is wholly inappropriate.

¶26. Ignoring the issues of bias and procedure, the State focuses on the ends rather than the means. The State claims that increasing Clay's bail was not error because Judge Sanders had ample evidence suggesting that Clay posed a flight risk and a danger to the community. The State's argument is based upon Clay's arrest and indictment on two counts of possession of a weapon by a convicted felon and eleven counts of the misdemeanor offense of contributing to the delinquency of a minor while out on the $20,000 bond

pending his trial for aggravated assault. A motion was filed after Clay's arrest and indictment asking Judge Sanders to increase Clay's bond.

¶27. Apparently this motion was never heard by Judge Sanders. Neither did she consider such evidence at the time she actually increased Clay's bond. The record clearly reveals that Judge Sanders raised Clay's bond for no other reason that to expedite the case. Had Judge Sanders considered the new arrest and indictment then she could have properly determined that Clay was a flight risk or a danger to the community. She did not consider such evidence, and this Court should not assume that she did.

¶28. The State also comments on the fact that this Court has three times previously denied bond pending appeal in Clay's case, finding that the trial court determined Clay to be a flight risk after his conviction. These denials occurred under different circumstances which are not a part of this record and occurred after Clay's conviction for aggravated assault.

<strong><u>CONCLUSION</u></strong>

¶29. While Clay's status as an indigent or the need to raise his bail may not be certain, Judge Sanders's course of conduct was clearly an abuse of judicial discretion which constitutes reversible error. Such errors combined to make Clay's decision to proceed to trial pro se involuntary and violated his right to effective counsel. The judgment of the Wilkinson County Circuit Court is reversed, and this case is remanded to that court for a new trial.

¶30. **REVERSED AND REMANDED.**

**PRATHER, C.J., BANKS, P.J., McRAE, MILLS, WALLER AND COBB, JJ., CONCUR. SMITH AND DIAZ, JJ., NOT PARTICIPATING.**