# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CT-02081-SCT

*TYLER EDMONDS*

*v.*

*STATE OF MISSISSIPPI*

## ON MOTION FOR REHEARING
## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 07/24/2004 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JIM WAIDE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 05/10/2007 |
| MOTION FOR REHEARING FILED: | 02/14/2007 |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    The motion for rehearing is denied.  The original opinions are withdrawn and these opinions are substituted therefor.

¶2.    Tyler Edmonds was convicted of the capital murder of Joey Fulgham and sentenced to a term of life in the custody of the Mississippi Department of Corrections.  Tyler appealed his conviction and sentence, and this Court assigned the appeal to the Court of Appeals.  *See*

M.R.A.P. 16(b). A divided Court of Appeals affirmed Tyler's conviction and sentence. *Edmonds v. State*, 2006 Miss. Ct. App. LEXIS 311 (Miss. Ct. App. 2006). We granted Tyler's petition for writ of certiorari and now we find that Tyler was denied a constitutionally fair trial, reverse the judgments of the Court of Appeals and of the Circuit Court of Oktibbeha County and remand this case to the circuit court for a new trial in accordance with this opinion.

## FACTS[1]

¶3.     On Friday, May 9, 2003, Kristi Fulgham, who was married to the victim Joey Fulgham, picked up her thirteen-year-old half-brother, Tyler Edmonds, to take him to the Fulgham home in the Longview community as she did every other weekend. She and Tyler have the same father, Danny Edmonds. Tyler's videotaped confession relates the following series of events: After arriving at Kristi and Joey's home, Tyler and Kristi went out for Subway sandwiches for dinner. After dinner, Joey went to bed, while Kristi stayed up and used the computer. Tyler fell asleep on the floor next to Kristi, and during the night, she woke him up and put him in the bed of one of her children. Between three-thirty and four o'clock the alarm clock went off, waking Tyler. He then went into the bedroom where Joey slept and, with Kristi's help, shot Joey in the back of the head with a .22 caliber rifle that Tyler had brought with him at Kristi's request. Kristi and Tyler then loaded her three children into the car and took the computer and her jewelry, which, according to Tyler, was

---

[1]The rendition of facts is based on the Court of Appeals' majority opinion. *Edmonds*, 2006 Miss. Ct. App. LEXIS 311, 4-18.

to make it look as if there had been a robbery. Tyler said he also thought Kristi took Joey's wallet. They then traveled to Jackson. The gun was never found. The group went to Jackson to pick up Kristi's boyfriend, Kyle Harvey, and then went to the Mississippi Gulf Coast. They stayed at the Beau Rivage and played on the beach. On Sunday, Tyler called his mother and wished her a happy Mother's Day. On their way back to Jackson, Kristi received several cell phone calls telling her that Joey had been murdered.

¶4. Both Tyler and Kristi voluntarily appeared at the sheriff's department for questioning in Joey's murder. Kristi placed total blame on Tyler, and Tyler eventually confessed to participating in Kristi's plan. Tyler was indicted for capital murder and tried as an adult in circuit court. The jury returned a guilty verdict and he was sentenced to life imprisonment. After his notice of appeal was filed, we assigned the case to the Court of Appeals, which affirmed the judgment and sentence. We granted Tyler's petition for writ of certiorari.

## DISCUSSION

### I.    *DAUBERT* HEARING.

¶5. Rule 702 of the Mississippi Rules of Evidence is the standard for the admission of expert testimony in Mississippi. When determining admissibility of expert testimony, courts must consider whether the expert opinion is based on scientific knowledge (reliability) and whether the expert opinion will assist the trier of fact to understand or determine a fact in issue (relevance). *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 38 (Miss. 2003). We also consider factors mentioned in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993): (1) whether the theory can be, and has been,

3

tested; (2) whether the theory has been published or subjected to peer review; (3) any known rate of error; and (4) the general acceptance that the theory has garnered in the relevant expert community. *Id*., at 593-94.

¶6.     We find that the circuit court did not err in excluding the testimony of Allison D. Redlich, Ph.D., concerning involuntariness of confessions because, during the extensive ***Daubert*** hearing held by the circuit court, Dr. Redlich herself admitted that her theories could not be empirically tested.

## II.     SPECULATIVE TESTIMONY BY EXPERT WITNESS.

¶7.     Stephen Hayne, M.D., conducted the autopsy on Joey's body and testified at trial as to the cause of death. During his testimony, Dr. Hayne espoused a two-shooter theory almost to the exclusion of a single-shooter theory:

> Q:     Dr. Hayne, you testified earlier that the defendant's statement that you saw was consistent with how the gunshot wound occurred?
>
> A:     It would be consistent with the physical findings that I observed and the information provided to me by opposite side counsel.
>
> Q.     And do you understand that the evidence is that two people fired that shot?
>
> A:     That was essentially the summary of the information given to me and seen on the video.
>
> Q:     And let's suppose if one person had fired that shot, would your opinion be the same?
>
> A:     I could not exclude that; however, I would favor that a second party be involved in that positioning of the weapon . . . *it would be consistent with two people involved. I can't exclude one, but I think that would be less likely. . . .*

4

Q: Are the injuries Mr. Fulgham sustained consistent within a reasonable degree of medical certainty with the defendant's version of how he was shot?

A: They are consistent within reasonable medical certainty.

Tyler' attorney objected to the testimony and requested a ***Daubert*** hearing, arguing that such testimony was beyond Dr. Hayne's area of expertise. The circuit court denied the request, but the Court of Appeals recognized that such testimony was scientifically unfounded: "You cannot look at a bullet wound and tell whether it was made by a bullet fired by one person pulling the trigger or by two persons pulling the trigger simultaneously." ***Edmonds*** at ¶ 51. We agree.

¶8. While Dr. Hayne is qualified to proffer expert opinions in forensic pathology, a court should not give such an expert carte blanche to proffer any opinion he chooses. There was no showing that Dr. Hayne's testimony was based, not on opinion or speculation, but rather on scientific methods and procedures. *See, e.g.*, ***Moss v. Batesville Casket Co.***, 935 So. 2d 393, 404 (Miss. 2006). The State made no proffer of any scientific testing performed to support Dr. Hayne's two-shooter theory. Therefore, the testimony pertaining to the two-shooter theory should not have been admitted under our standards.

¶9. A ruling on evidence is not error unless a substantial right of the party is affected. ***Green v. State***, 614 So. 2d 926, 935 (Miss. 1992). We have no alternative but to find that Tyler's substantial rights were affected by Dr. Hayne's conclusory and improper testimony. Juries are often in awe of expert witnesses because, when the expert witness is qualified by

5

the court, they hear impressive lists of honors, education and experience. An expert witness has more experience and knowledge in a certain area than the average person. *See* M.R.E. 702. Therefore, juries usually place greater weight on the testimony of an expert witness than that of a lay witness. *See generally Simmons v. State*, 722 So. 2d 666, 673 (Miss. 1998); *see also United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1999) (an expert's "stamp of approval" on a particular witness's testimony [or theory of the case] may unduly influence the jury). Here, Dr. Hayne's two-shooter testimony impermissibly (because it was not empirically proven) bolstered the State's theory of the case that Kristi helped Tyler to fire the gun. The error was magnified when Dr. Hayne's testimony was the only evidence – other than Tyler's contested confession – to support the State's theory of the case.

¶10.    However, we find that a full-scale *Daubert* hearing is not required when an expert witness proffers an "off-the-cuff" opinion as Dr. Hayne did. *See, e.g., Miller v. Baker Implement Co.*, 439 F.3d 407, 412 (8th Cir. 2006) ("While *Daubert* hearings may be necessary in some cases, the basic requirement under the law is that the parties have an 'opportunity to be heard before the district court makes its decision.'") (quoting *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 n.3 (8th Cir. 2003)); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001) (citing *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999) (a "court is not required to hold an actual hearing to comply with *Daubert*"))). As the United States Supreme Court has stated, "The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate

6

reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (emphasis in original).

¶11.    Here, after the defense requested a ***Daubert*** hearing, both counsel approached the bench and gave a brief argument.  Therefore, the defense had an opportunity to be heard, but the circuit court erroneously allowed the testimony.

## III.    INVOCATION OF THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION AND M.R.E. 804.

¶12.    Even though Tyler included Kristi Fulgham on his witness list and issued a subpoena for her to appear, he never called her to the stand.  Instead, he attempted to introduce evidence of some of Kristi's statements to Danny Edmonds, Kristi and Tyler's father, which tended to show motive on her part.  Danny gave a statement to law enforcement officers which provided the probable cause to arrest Kristi.  He told officers that Kristi had asked him for a pistol because "she wanted Joey dead" and that she would kill him in his sleep.  He also stated that Kristi said she was "tired of Joey beating her up and beating her kids up," and that if she divorced Joey, his mother would take care of her children.  Kristi also told him that Joey had several hundred thousand dollars in life insurance that would go to her if he were dead.  The circuit court ruled that this evidence was inadmissible hearsay.  On appeal, Tyler argues that this ruling was error because the statements were admissible as statements against

7

interest under M.R.E. 804[2] inasmuch as they showed Kristi's motives for killing her husband. The State argues that the statements are not admissible under this exception because Tyler did not show that Kristi, even though she intended to invoke the Fifth Amendment privilege against self-incrimination, was "unavailable" under 804. Thus, we are presented with the question of when a witness who intends to invoke the Fifth becomes "unavailable" under 804.

### A.    Invocation of the Fifth Amendment Privilege.

¶13.    The Fifth Amendment to the United States Constitution declares in part that "No person . . . shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment privilege against self-incrimination may be invoked where a witness has "reasonable cause to apprehend danger from a direct answer." ***Hoffman v. United States***, 341 U.S. 479, 486, 71 S. Ct. 814, 818, 95 L. Ed. 1118 (1951). Under the Sixth Amendment's guarantee of the right to call witnesses, it is generally accepted that a defendant may call a witness who intends to invoke the Fifth to the stand in order that the jury can observe the

---

[2]Under the Mississippi Rules of Evidence, the hearsay statements of a witness who is unavailable to testify at trial may be admissible. Rule 804 provides in pertinent part:

**(b)    Hearsay Exceptions. . . .**

(3)    *Statement Against Interest.*  A statement which was at the time of its making so far . . . tended to subject [the declarant] to civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

8

witness's responses.  *See, e.g., **Stewart v. State***, 355 So. 2d 94, 95-96 (Miss. 1978) (trial

court committed reversible error by not allowing defendant to call witness who intended to

invoke the privilege against self-incrimination); *see also **Bell v. State***, 812 So. 2d 235, 238-

39 (Miss. Ct. App. 2001) (same); ***Hall v. State***, 490 So. 2d 858 (Miss. 1986) (same);

***Coleman v. State***, 388 So. 2d 157, 159 (Miss. 1980) (same).[3]

¶14.    The United States Supreme Court has never held that permitting a witness to assert

his or her Fifth Amendment privilege against self-incrimination without taking the witness

stand violates a defendant's right to a fair trial.  *See, e.g., **Davis v. Straub***, 430 F.3d 281, 287

(6th Cir. 2005).  Indeed, the United States Supreme Court has held that, because the witness

was not called to testify, the witness did not expressly invoke the privilege, and "the absence

of this formality is not decisive." ***Lee v. Ill.***, 476 U.S. 530, 550,  106 S. Ct. 2056, 90

L. Ed. 2d 514 (1986).  Other courts have held that where a criminal defendant wishes to call

a co-defendant to testify, such a co-defendant is "unavailable" for testifying under the

evidentiary rule which creates the hearsay exception for statements against interest. *See, e.g.,*

***United States v. Hepburn***, 86 Fed. Appx. 475, 476 (2d Cir. 2004) (trial court's determination

that co-defendant was unavailable under F.R.E. 804(a) due to his intention to invoke his Fifth

Amendment privilege if called to testify not error); ***United States v. Adderly***, 51 Fed. Appx.

---

[3]Note that these cases use *permissive* language instead of *obligatory* language:  if a defendant wishes to call someone to the stand for the jury to observe the witness invoke the Fifth, he has the right to do so, but it is not mandatory. *See contra **Slater v. State***, 731 So. 2d 1115, 1117-18 (Miss. 1999) (asserter of the privilege must be called to the stand and there refuse to testify before he becomes unavailable).

69, 69-70 (2d Cir. 2002) (no abuse of discretion where trial court did not require co-defendants personally assert their Fifth Amendment privilege before the court); *United States v. Thomas*, 571 F.2d 285, 288-90 (5th Cir. 1978) (co-defendant's testimony clearly unavailable under Rule 804(a)(1) – co-defendant's unavailability as a witness was "patent"); *United States v. Chan*, 184 F. Supp. 2d 337, 441 (S.D.N.Y. 2002) (assertion of privilege by co-defendant's attorney is sufficient).

¶15.   The United States Court of Appeals for the Fifth Circuit, citing *Thomas*, has discussed this issue in depth:

> Thus, it is clear that a witness who is unavailable because he has invoked the Fifth Amendment privilege against self-incrimination is unavailable under the terms of 804(a)(1).
>
> The government argues, however, that in order for a witness to be unavailable under the rule, the witness claiming the Fifth Amendment privilege must be exempted from testifying by a ruling of the court. The government contends that the appellant never tendered Keller or Kemp for questioning so that the district court could rule on the validity of their asserted privilege. In *Thomas*, we further held:
>
>> Rule 804(a)(1) requires an express assertion of the privilege and a ruling by the court that the privilege constitutes unavailability, see 4 Weinstein's Evidence para. 804(a)[01] (1976), but here the existence of the privilege and Weeks' right to assert it and Weeks' unavailability as a witness are patent. The trial court declared the evidence inadmissible before reaching issues raised by Rule 804. It would be mere formalism to abjure the merits of [defendant's] claim in these circumstances. *See U.S. v. Oropeza*, 564 F.2d 316, 325 n.8 (9th Cir. 1977).

Ibid.

> Thus, although Rule 804(a)(1) literally requires the court to rule upon the validity of the witness' assertion of the privilege, our ruling in **Thomas** indicates that such a requirement need not be met when its fulfillment would be a mere "formalism." It is clear from the record that the district court assumed a proper claim of the privilege had been made but held that the claim did not render the witnesses unavailable. The court simply concluded that Rule 804(a)(1) did not have application to unavailability because of the claim of Fifth Amendment privilege. As in **Thomas**, the "trial court declared the evidence inadmissible before reaching issues raised by Rule 804." We, therefore, conclude that it was unnecessary for the court to have ruled with more specificity as to the validity of Kemp's and Keller's asserted privilege against self-incrimination. It was clear to all participants that each claim would have been made. In fact, the government stipulated at trial that Kemp and Keller would assert their Fifth Amendment privilege if called to testify.

*United States v. Young Bros., Inc*., 728 F.2d 682, 691 (5th Cir. 1984).

¶16.    In all of the preliminary proceedings and during the trial, Kristi Fulgham's defense counsel was present to insure that she would not be prejudiced in any way. Her defense counsel filed a motion to prevent Kristi from being called to testify, and also appeared at both a pretrial hearing and at trial to state for the record that Kristi would invoke her Fifth Amendment right: "It's not if she invokes her privilege. She will invoke her privilege. I've been unequivocal about that and I have spoken with her and that is our intention and will not change." Other jurisdictions do not require placing the witness on the stand to invoke the Fifth, finding that the privilege may be asserted through counsel. *United States v. Williams*, 927 F.2d 95, 99 (2d Cir. 1991); *Chan*, 184 F. Supp. 2d at 341.

11

¶17.   In *Woodham v. State*, 800 So. 2d 1148, 1154-55 (Miss. 2001), we approved of a "blanket" invocation of the Fifth Amendment:

> [A] blanket claim of the privilege is proper where the proceeding is criminal in nature and the record affirmatively reflects (1) the witnesses are potential accessories to the same crime; (2) the witnesses upon the advice of their lawyers, would have invoked their Fifth Amendment privilege to each and every specific question, and (3) the trial judge has sufficient information to determine, in fact, that answering any questions at all about the offense would tend to incriminate the witnesses. Both Boyette and Thompson were potential defendants in pending cases here, – Boyette had been indicted for accessory to murder and Thompson had been charged in youth court. We hold, therefore, that they were entitled to Fifth Amendment protection and that there was no error here as there was no question proffered which would be outside the scope of that privilege.

¶18.   Kristi was charged with capital murder in the murder of her husband – the same crime with which Tyler was charged. Kristi's attorney asserted to the circuit court that, if called, she would invoke her privilege against self-incrimination. Tyler made a proffer of the statements which he wished to introduce as statements against interest, so the circuit court knew what information Tyler wished to elicit from Kristi. However, since Kristi was never called as a witness and we do not have a specific ruling by the circuit court to review, we do not address the issue of what is required to assert the Fifth Amendment.

**B.     Admissibility of Kristi's Statements Against Interest.**

¶19.   Regardless of Kristi's availability as a witness, we must address the issue of the admissibility of Kristi's admission as the issue is likely to reoccur on retrial. We find that the circuit court erred in excluding the proffered testimony of Danny Edmonds as

12

inadmissible hearsay. Rule 804 of the Mississippi Rules of Evidence provides that, if a witness is "unavailable" to testify, testimony from other witnesses about statements made by the unavailable witness is not inadmissible hearsay. Rule 804(a)(1) provides that an unavailable witness includes one who "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statements. . . ." Rule 804(b)(3) further provides that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

¶20. Under 804, for a statement against interest to admissible, the statement must be against the witness's penal interest. Although the remarks did not amount to a clear confession to a crime, they would would have probative value in the State's case against Kristi. *Thomas*, 571 F.2d at 289. As the Fifth Circuit held,

> The statement offered by Thomas satisfies the requirement that it be against Weeks' penal interest. The government argues that Weeks' statement was not against his penal interest because he did not expressly confess to the crime involved. We do not read Rule 804(b)(3) to be limited to direct confessions of guilt. Rather, by referring to statements that "tend" to subject the declarant to criminal liability, the Rule encompasses disserving statements by a declarant that would have probative value in a trial against the declarant. Thus, in *U.S. v. Bagley*, 537 F.2d 162 (5th Cir. 1976), *cert. denied*, 429 U.S. 1075, 97 S. Ct. 816, 50 L. Ed. 2d 794 (1977), we held to be against penal interest a statement that the declarant had given the accused a package of heroin instead of a package of Valium. Although the statement did not confess to the crime charged against the accused (possession with intent to distribute heroin), the statement implied the declarant's guilt of a felony, knowing possession of heroin.

13

*See also* **United States v. Sarmiento-Perez**, 633 F.2d 1092, 1101 (5th Cir. 1981) (the circumstance that the out-of-court statement would have probative value in a trial against the declarant himself is indicative that it is sufficiently against his penal interest as to be reliable). The statements clearly indicate her intention to murder her husband and would be probative in the State's case against Kristi for Joey's murder. Therefore, they are sufficiently against Kristi's penal interest to fall under Rule 804.

¶21. Another consideration for the admission of a statement against interest is whether it shows particularized guarantees of trustworthiness. **Jacobs v. State**, 870 So. 2d 1202, 1208 (Miss. 2004). However, corroboration as required by Rule 804(b)(3) is not required to be absolute, and the sufficiency of the corroboration must be assessed in the light of the importance of the evidence and the offeror's fundamental constitutional right to present evidence. **Lacy v. State**, 700 So. 2d 602, 607 (Miss. 1997). Here, we find that Danny's testimony was sufficiently trustworthy because Danny was both Kristi and Tyler's father. Surely, he had a significant reason not to inculpate Kristi, and it is reasonable to assume that he would not testify that she made the statements unless she really did make the statements.

¶22. Moreover, Danny Edmonds's statement is corroborated by other evidence: Kristi had previously inquired about Joey's life insurance with the National Guard, and Joey's body was found in his bed, consistent with someone who had been shot in his sleep. The statements are further corroborated by Tyler's testimony that Kristi asked him to find a gun for her.

¶23. The Supreme Court has stated:

14

Few rights are more fundamental than that of an accused to present witnesses in his own defense. In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. *In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.*

*Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 1050, 35 L. Ed. 2d 297, 312-13 (1973) (citations omitted) (emphasis added).

## IV.    EXCLUSION OF VIDEOTAPE.

¶24. Tyler attempted to offer in his defense a video of Kristi and Joey's appearance on the Montel Williams Show. The video would have been offered as evidence of Kristi's motive to murder Joey. On the show, she admitted to having an affair with her husband's best friend and subsequently having his friend's child while the two were married. The tape would have revealed the tumultuous nature of their relationship. Kristi told Montel that Joey often told her that she would "burn in hell." Joey also said that they fought on a daily basis:

> Montel:    So now there's a baby here. But you said pointedly you want to keep her – or not keep her. You want to stay married, correct?

> Joey:    Yes.

15

Montel:     But you're going to make her pay.

Joey:       I'm going to remind her of it every moment I get.

(Gasps from audience.)

Montel:     Well, then, why stay together?

Joey:       I love her.  I mean, I really do.  She messed up, big.  I mean, tremendously big.  I only throw it up in her face mainly when we get in big arguments.

Montel:     How often is that?

Joey:       Daily.

Kristi:     No lie.

Montel:     So you get in a big argument every day.

Joey:       Pretty much.

¶25.    Relying on ***Langston v. State***, 373 So. 2d 611, 613 (Miss. 1979), and ***Brown v. State***, 340 So. 2d 718 (Miss. 1976), the State argued that evidence presented on behalf of one defendant cannot unfairly prejudice the right of the co-defendant, and this evidence would be unfairly prejudicial to Kristi.  The circuit court excluded the video on the grounds that it would violate M.R.E. 403 as "the probative value of th[e] evidence [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury."

¶26.    This ruling was erroneous.  The cases cited by the State apply only where co-defendants are tried jointly.  Here, Tyler was given a separate trial.  Thus, the evidence is in

16

no way unfairly prejudicial to Kristi because the evidence would not have been presented to her jury.

¶27. Exclusion of this highly relevant evidence was an abuse of discretion. We have long held that such evidence is relevant to show a person's motive to kill. *Montgomery v. State*, 515 So. 2d 845, 848 (Miss. 1987) (evidence of a "turbulent relationship" between victim and defendant relevant to defendant's motive); *Church v. State*, 182 Miss. 802, 808, 183 So. 525, 526 (1938) (evidence of extra-marital affairs relevant to show motive to kill spouse).

¶28. Exclusion of the videotape was an abuse of discretion.

## VI. DENIAL OF RIGHT TO A FUNDAMENTALLY FAIR TRIAL.

¶29. "A criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Terry v. State*, 718 So. 2d 1115, 1123 (Miss. 1998) (citing *Love v. State*, 441 So. 2d 1353, 1356 (Miss. 1983)). In *Terry*, we reversed the conviction, holding that the defendant was entitled to have the jury determine whether someone else committed the crime. *Id.* at 1123. Here, the only direct evidence that Tyler was involved in Joey's murder was Kristi's allegations that Tyler killed Joey and Tyler's disputed confession. Tyler had absolutely no motive to kill Joey other than to please Kristi. Tyler had no expectation of financial gain from Joey's death. Kristi, on the other hand, had the means, the motive and the opportunity to kill Joey. *See, e.g., Oswalt v. State*, 885 So. 2d 720, 723 (Miss. Ct. App. 2004). Only she would benefit financially by his death. And, with Joey's death, she would be delivered from an unhappy marriage.

17

¶30. Testimony at trial showed that Kristi and Joey had a tumultuous relationship. In the year prior to the murder, Kristi (while still married to Joey) was dating one man and then met Kyle Harvey. Kristi moved out of her house with Joey and began living with Harvey in Jackson; then she moved back in with Joey, but she continued to see Harvey. She led Harvey into believing that she and Joey were divorced. She had a child by a third man during her marriage with Joey. She would often manipulate Tyler into lying to her different boyfriends to cover some dishonesty. An essay he wrote for a school assignment showed that Tyler adored Kristi. He wrote, "I love my sister more than I love myself." In order to manipulate Tyler to confess to killing Joey, Kristi told him that he would not go to jail for murdering Joey because he was a juvenile, and that if she was convicted, she would face capital murder charges and her children would be without a mother.

¶31. A few months before the murder, Kristi called the National Guard administrative office where Joey was stationed and inquired into the amount of life insurance Joey had. Kristi was unaware that Joey had changed the beneficiary on his $250,000 policy from Kristi to his mother, so she believed that she was the beneficiary of at least $300,000.

¶32. The circuit court's refusal to allow Danny Edmonds to testify about Kristi wanting to kill Joey and the circuit court's refusal to allow the jury to see the Montel Williams videotape clearly prejudiced Tyler. Even though the jury had before it some background evidence as to Kristi's character, actions and motivation, the excluded evidence – that Kristi and Joey fought on a continuous basis and that Kristi desired to kill and was planning on killing Joey

18

– would have strengthened Tyler's defense, possibly creating reasonable doubt in the minds of the jurors.

## CONCLUSION

¶33. For the foregoing reasons, we reverse the judgments of the Circuit Court of Oktibbeha County and the Court of Appeals and remand this case to the Circuit Court of Oktibbeha County for a new trial in accordance with this opinion.

¶34. **REVERSED AND REMANDED.**

**SMITH, C.J., DIAZ, P.J., CARLSON, GRAVES AND RANDOLPH, JJ., CONCUR. DIAZ, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, P.J., AND CARLSON, J. SMITH, C.J., JOINS IN PART. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION. DICKINSON, J., NOT PARTICIPATING.**

**DIAZ, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶35. I agree with the majority that Tyler was denied his right to a fundamentally fair trial, and therefore concur in the reversal of the Court of Appeals and the trial court. However, I write separately to address the error in excluding Dr. Redlich's testimony, and because this Court should not qualify Dr. Hayne as an expert in forensic pathology. I also write to address the trial court's errors in admitting Tyler's confession, in denying bail and improperly informing the jurors of the possible sentence.

### I. The Trial Court Committed Reversible Error by Excluding Relevant Expert Testimony Concerning False Confessions.

¶36. In stark contrast to the total absence of a ***Daubert*** hearing for Dr. Hayne's testimony, the trial court spent an *entire day* examining Tyler's expert. The trial judge ultimately found

19

Dr. Redlich's testimony inadmissible, and the Court of Appeals held that this was not an abuse of discretion. The Court of Appeals' analysis is full of errors and inconsistencies which must be addressed.

¶37.    Dr. Redlich was prepared to testify that Tyler's behavior was consistent with a false confession. She would have testified that false confessions do occur, juveniles are more likely to confess falsely than adults, youth and heightened suggestibility are traits that contribute to the likelihood of false confessions, many false confessions result from pressure placed on a vulnerable person by a family member or friend, and police interrogation procedures such as separating a child from his parents during interrogation can lead to false confessions.   She also would have testified that false confessions are often recanted soon after they are made, they do not match crime scene evidence and other witness statements, they contain inaccuracies and inconsistences, and they often minimize the involvement of the confessor.

¶38.    According to the court-appointed experts, which, oddly, neither the defense nor the prosecution were allowed to use:

> Mr. Edmonds is less mature emotionally and psychologically than he is intellectually. . . Mr. Edmonds appears to have greater emotional needs for the approval of adults than most adolescents of his chronological age.  Because of this, he tends to idealize adults whom he perceives as being kindly disposed toward him, and appears to be more easily influenced by adult authority figures than most adolescents.  Finally, despite his above average intellectual and verbal abilities, Mr. Edmonds does not appear to be at all "street smart."  This naivete also contributes to his tendency to be influenced by, and to attempt to please others, especially adults.

Additionally, and consistent with Dr. Redlich's proposed testimony, Tyler tried to recant soon after he gave his initial statement, and his confession contained inaccuracies and

20

inconsistencies. For example, he said that he and Kristi told Kyle Harvey that they had shot Joey. Mr. Harvey, who was called as a witness for the prosecution, testified that they never told him of the murder. Tyler also stated that he saw sprinkles of blood on a white pillowcase immediately after the shot was fired. However, videotape of the crime scene showed that the sheets and pillowcases were neither white nor covered with any blood. An officer at the crime scene also testified that the sheets were khaki-colored and there was no blood on them. Finally, Tyler tried to limit his involvement in his confession. He said that he thought the gun was broken and did not think it would fire. He also said that Kristi was standing behind him, they were both holding the gun, and neither of them were aiming it. When asked if Kristi was saying anything, Tyler responded, "I don't know. I wasn't really – I just closed my eyes. I was just, you know, letting everything go, just not paying attention trying to stay out of it."

¶39. In Tyler's case, the trial judge examined how often other courts admitted false confession testimony to gauge its acceptance in the scientific community. Finding that courts were split on whether such testimony was admissible, the judge found that the theory was not "widely accepted." However, a scientific theory's *acceptance in the legal community* does not relate to its *acceptance in the scientific community*. Out of the twenty cases that the trial court examined concerning false confessions, only two intermediate courts from Alaska and New Jersey found that such expert testimony was not sufficiently reliable. *Vent v. State*, 67 P.3d 661, 669 (Alaska Ct. App. 2003); *State v. Free*, 798 A.2d 83, 92 (N.J. Super. Ct. App. Div. 2002). When such testimony has not been allowed in other courts, it is simply because it related to the credibility of the witness, not because it was scientifically unreliable. *See*

21

*United States v. Adams*, 271 F.3d 1236, 1246 (7th Cir. 2003); *People v. Gilliam*, 670 N.E.2d 606 (Ill. 1996); *State v. Cobb*, 43 P.3d 855, 866 (Kan. Ct. App. 2002); *Bixler v. State*, 582 N.W.2d 252, 256 (Minn. 1998); *State v. Davis*, 32 S.W.3d 603, 608 (Mo. Ct. App. 2000). This is precisely the same reasoning this Court previously employed, and recently rejected, to exclude testimony from child sex abuse experts. *Hobgood v. State*, 926 So. 2d 847 (Miss. 2006) (admission of expert testimony regarding credibility of child victim not reversible error); *State v. Crawford*, 754 So. 2d 1211, 1217 (Miss. 2000) (expert allowed to testify whether victim's behavior was consistent with that of a sexually abused child); *Hall v. State*, 611 So. 2d 915 (Miss. 1992) (same). *Cf. Goodson v. State*, 566 So. 2d 1142, 1153 (Miss. 1990) (admission of such testimony is reversible error).

¶40.    Dr. Redlich's area of expertise also encompasses the credibility of sexually abused children.  She testified that both areas of expert testimony share the same problems in that error rates are not applicable and the theories cannot be tested.  As such, our case law calls for a more flexible standard.  For example, in *Poole v. Avara*, 908 So. 2d 716, 723 (Miss. 2005), this Court held that absence of publication and peer review does not automatically require exclusion:

> [O]ur opinion in *McLemore* clearly states that "It is important to note . . . that the factors mentioned in *Daubert* do not constitute an exclusive list of those to be considered in making the determination: *Daubert*'s 'list of factors was meant to be helpful, not definitive.'" 863 So. 2d at 39 (quoting *Kumho Tire*, 526 U.S. at 151, 119 S. Ct. 1167).  Looking to the Fifth Circuit for guidance, the Court re-emphasized that the *Daubert* list is illustrative, but is not exhaustive. *Id*. at 38 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)). Mississippi is not unique in its interpretation of *Daubert*. The *Daubert* Court itself did not claim it was rigidly defining elements required for expert

testimony to be admissible, but rather providing only "general observations" it deemed appropriate. 509 U.S. at 593. Indeed the Court stated, "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." *Id.* A later look at *Daubert* by the U.S. Supreme Court provided the same result, concluding that "We can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert* . . . . Too much depends upon the particular circumstance of the particular case at issue." *Kumho Tire*, 526 U.S. at 150.

908 So. 2d at 723.

¶41.    However, the majority accepts the trial court's stringent application of the four *Daubert* factors to find Dr. Redlich's testimony inadmissible. It finds no error because the theory "[can] not be empirically tested." Moreover, Justice Easley's separate opinion cites the trial court's conclusion that "nothing in *Daubert* or its progeny hold that testability should be waived when evaluating the reliability of social science testimony." This statement simply does not comport with the universal agreement that the *Daubert* elements are mere factors to be considered and that the analysis is quite flexible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238, 252 (1999) ("those [*Daubert*] factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged").

¶42.    There are additional problems with the Court of Appeals' findings of fact relating to Dr. Redlich's testimony. The trial court found that false-confession research was "subject to limited peer review by a very small group of researchers." The Court of Appeals then found that the number of experts was limited to six. *Edmonds* at ¶ 34. However, an amicus brief filed with the Court of Appeals states that the number of experts is at least 60, and in 1992

23

there were nearly 800 articles relating to false confessions and police interrogations. *See* Gisli H. Gudjonnson, *The Psychology of Interrogations and Confessions: A Handbook*, 631-62 (1992).

¶43.    Moreover, the detractors relied on by the trial court would not qualify as experts in the field.    Dr. Welner testified at the ***Daubert*** hearing that he has never published a peer-reviewed article on false confessions.  Paul Cassell, who asserts there is a 45% error rate, is a judge and legal scholar, not a social scientist.  Finally, the trial court found that there was only "one laboratory experiment to back it up."  In fact, several methods are used to examine false confessions and numerous studies have been published.  *See* Saul M. Kassin and Gisi J. Gudjonsson, *The Psychology of Confessions: A Review of the Literature and Issues*, 5 Psychological Science in the Public Interest 2 (Nov. 2004).

¶44.    Unfortunately, this case provides a disheartening example of the double standard applied to expert testimony in criminal cases.  The majority accepts the rigorous ***Daubert*** analysis applied to Dr. Redlich, but deems Dr. Hayne qualified in forensic pathology. Likewise, this Court requires very little from other expert testimony offered against criminal defendants.  Just as we allow a great deal of flexibility in the standard for child sex abuse experts, this Court has never required bite-mark "experts" to meet any one of the ***Daubert*** factors required of Dr. Redlich.  ***Howard v. State***, No. 2003-DR-01881-SCT at ¶¶ 72-74 (Miss. Sept. 28, 2006) (not error to allow bite-mark testimony when defense did not provide an affidavit from an expert witness as rebuttal evidence); ***Stubbs v. State***, 845 So. 2d 656, 669 (Miss. 2003) (expert testimony admissible, even though "[t]here is little consensus in the

24

scientific community on the number of points which must match before any positive identification can be announced"); ***Brooks v. State***, 748 So. 2d 736, 739 (Miss. 1999) (expert testimony admissible, yet "there are no established guidelines in evaluating bite-mark evidence").

¶45.   A trial court may not selectively apply the Rules of Evidence.  Unfortunately,  these rules were arbitrarily applied when  Dr. Hayne was allowed to testify to something that no man can know, and Tyler was denied the opportunity to present expert evidence in his defense.  For the foregoing reasons, the jury should have heard Dr. Redlich's testimony.

### II.  This Court Cannot Qualify Dr. Hayne as an Expert.

¶46.   While the majority finds that "Dr. Hayne is qualified to proffer expert opinions in forensic pathology," that determination is exclusively left to the trial courts; we only review that determination.  No expert is ***Daubert***-proof.  As science, like the law, evolves over time, one generation's expert is another's quack.

¶47.   There are serious concerns over Dr. Hayne's qualifications to provide expert testimony.  First, he admitted at trial that he was not certified in forensic pathology by the American Board of Pathology because he walked out on the qualifying examination.  This means he is unqualified to serve as State Medical Examiner, as our law requires that "[e]ach applicant for the position of State Medical Examiner shall, as a minimum, be a physician who is eligible for a license to practice medicine in Mississippi and be certified in forensic pathology by the American Board of Pathology."  Miss. Code Ann. § 41-61-55 (Rev. 2005).

¶48. Second, Dr. Hayne testified that in his twenty-five-year career, he has performed 25,000 to 30,000 autopsies. This would mean that he has performed at least 1,000 autopsies per year since he was admitted to practice, which seems highly unrealistic.

¶49. Finally, a recent magazine article reported on another case where Dr. Hayne presented questionable testimony. The article examined his qualifications and even discussed his testimony in Tyler's case:

> Mississippi's forensic pathology system is, in the words of one medical examiner I spoke with, "a mess." The state has no official examiners. Instead, prosecutors solicit them from a pool of vaguely official private practitioners to perform autopsies in homicide cases. Steven Hayne, who performed the autopsy on Jones, appears to be a favorite. In the words of Leroy Reddick, a respected medical examiner in Alabama, "Every prosecutor in Mississippi knows that if you don't like the results you got from an autopsy, you can always take the body to Dr. Hayne." Defense attorneys in the state bristle at Hayne's name. In a case last year in Starkville, he testified that he could tell by the wounds in a corpse that there were two hands on the gun that fired the bullet, consistent with the prosecution's theory that a man and his sister team jointly pulled the trigger. Several medical examiners have told me such a claim is preposterous.
>
> Hayne testified at Maye's trial that he is "board certified" in forensic pathology, but he isn't certified by the American Board of Pathology, the only organization recognized by the National Association of Medical Examiners and the American Board of Medical Specialties as capable of certifying forensic pathologists. According to depositions from other cases, Hayne failed the American Board of Pathology exams when he left halfway through, deeming the questions "absurd." Instead, his C.V. indicates that he's certified by two organizations, one of which (the American Board of Forensic Pathology) isn't recognized by the American Board of Medical Specialties. The other (the American Academy of Forensic Examiners) doesn't seem to exist. Judging from his testimony in other depositions, it's likely Hayne meant to list the American College of Forensic Examiners. According to Hayne, the group certified him through the mail based on "life experience," with no examination at all. Several forensics experts described the American College of Forensic Examiners to me as a "pay your money, get your certification" organization. A February 2000 article in the *American Bar Association Journal* makes similar

26

allegations, with one psychologist who was certified through the group saying, "Everything was negotiable—for a fee."

Radley Balko, *The Case of Corey Maye*, Reason (Oct. 2006) (citing Mark Hansen, *Expertise to Go*, 86 A.B.A.J. 44-52 (Feb. 2000)).

¶50. Accordingly, this Court should not give Dr. Hayne, or any expert, a free pass to testify before our juries. With *Daubert*, we have equipped our trial judges with the appropriate tools to distinguish between qualified expert testimony and "quackspertise." It is up to them to make an individualized determination as to whether each expert meets the requirements of Rule 702.

### III. The Trial Court Erred in Admitting Tyler's Confession.

¶51. Tyler's mother brought her son to the police station not knowing that the police considered him a suspect. She testified that it was her understanding that signing the *Miranda* waiver meant that Tyler could only be questioned in her presence. However, after Tyler consistently denied any involvement in the murder, Sheriff Bryan instructed the officers to remove his mother from the room.

¶52. With Tyler's mother out of the room, the officers continued in their attempts to get Tyler to change his story. When he said he did not believe that Kristi would blame the murder on him, they brought her into the room to confront her little brother. Finally, after three hours of questioning, Tyler signed another *Miranda* waiver and agreed to make a videotaped confession. He later told the court-appointed psychiatrist that he "didn't know what half those words meant . . . that paper I signed had all kind of weird words on it, half of them I didn't

27

understand." He also said that he "was used to doing what adults told [him] to do, especially the police," and that the other prisoners had to explain to him that he "gave [his] rights away."

¶53. The sheriff's department videotaped Tyler's statement. On the videotape, just as he finishes confessing, one can see Tyler's mother force herself into the interrogation room to find that her son has confessed to the murder. In a heart-wrenching scene, Tyler tells his mother that he and Kristi "did it," all the while sobbing, head in hands, and unable to stand.

¶54. Soon after his confession, Tyler attempted to contact Sheriff Bryan to recant. When his court-appointed attorney had not shown up after four days, the sheriff agreed to take a second videotaped statement. In his second statement, Tyler said that Kristi had been asking him for a gun to kill a dog and that he had not known about the murder until after they had returned from Gulfport. He stated that when he learned of the murder, Kristi asked him to take the blame because if he did not, she would never "get to see [her] kids again." Tyler also testified at trial that Kristi said the police "wouldn't do anything to [him] because [he] was a minor." Two notes were introduced at trial that Kristi had written to Tyler in jail. In the notes, his sister urges Tyler to "say it was an accident," because "they want to see me fry . . . they are going to give me the death penalty." Tyler also testified that he thought he was helping his sister escape the death penalty by sharing the blame with her.

**(A) Tyler's Confession was Obtained in Violation of the Youth Court Act.**

¶55. At the time Tyler was questioned, neither he nor his mother were informed that there were charges against him. According to the interrogating officer's testimony, he was never even told that he was a suspect. Moreover, our case law holds that there is "no formal fixed

28

and definite charge against the appellant . . . until the Grand Jury acts." **Walker v. State**, 235

So. 2d 714-15 (Miss. 1970). Because Tyler had not been charged with murder, the provisions

of the Youth Court Act were still applicable, and his mother's removal from the room requires

that we reverse and remand for a new trial. **M.A.C. v. Harrison Cty. Family Ct.**, 566 So. 2d

472 (Miss. 1990) (adjudication reversed where parent was not present during interrogation).

As stated in **Smith v. State**, 534 So. 2d 194, 195 (Miss. 1988):

> At the time Smith gave his confession he had not been charged with any crime
> that would remove him from the Youth Court's jurisdiction. The crimes with
> which he had been charged, burglary, resisting arrest and assaulting a police
> officer, all fall within the Youth Court's jurisdiction. Therefore, the
> circumstances surrounding Smith's confession must satisfy the Youth Court
> Act.

*Id.*

¶56.     In this case, Tyler was not charged with any crime, thus the provisions of the Youth

Court Act were still applicable and his mother's removal violated Miss. Code Ann. § 43-21-

303(3) (Rev. 2004).   In **M.A.C.,** we did not reach the question of whether the evidence

obtained in such an unlawful interrogation was admissible, because the defendant's sentence

had already been served. 566 So. 2d at 475. Considering that absence of a parent or guardian

during the interrogation of a minor goes directly to the issue of voluntariness, such a violation

renders the statement inadmissible as a violation of basic constitutional guarantees. U.S.

Const. amend. V and XIV and Miss. Const. art. 3 § 26. The United States Supreme Court has

consistently recognized that juveniles under interrogation are particularly vulnerable and as

such require heightened levels of protection:

29

[A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights. . . [a] lawyer or other adult relative or friend could have given the petitioner the protection which his own immaturity could not.

*Gallegos v. Colorado*, 370 U.S. 49, 54-55, 82 S. Ct. 1209, 1212-13, 8 L. Ed. 2d 325, 328-29 (1962).

And when, as here, a mere child – an easy victim of the law – is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces.

*Haley v. Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 303-04, 92 L. Ed. 224, 228 (1948). And lastly, "authoritative opinion has cast formidable doubt upon the reliability and trustworthiness of 'confessions' by children." *In re Gault*, 387 U.S. 1, 52, 87 S. Ct. 1428, 1456, 18 L. Ed. 2d 527, 559-60 (1967). While the above cases certainly involved egregious police conduct, nothing in the above passages suggests that police must first beat a child or detain him incommunicado for days on end for the law to recognize the special vulnerability of juveniles. It is enough that Tyler's mother was removed from the room in violation of Miss. Code Ann. § 43-21-303(3).

¶57. In light of the foregoing, Tyler's confession was involuntary and inadmissible as a violation of Miss. Code Ann. § 43-21-303(3), Article 3, Section 26 of the Mississippi Constitution and the Fifth Amendment to the United States Constitution.

30

**(B) Tyler did not "Voluntarily, Knowingly and Intelligently" Waive his *Miranda* Rights.**

¶58. Tyler's signing of the ***Miranda*** waiver does not make the confession admissible. Even if the special protections of the Youth Court Act do not apply to Tyler, this Court is still permitted – indeed *required* – to examine the validity of a child's waiver of rights. Because Tyler's ***Miranda*** waiver was not made "voluntarily, knowingly and intelligently," admitting his confession at trial was a violation of his Fifth Amendment right against self-incrimination and Article 3, Section 26 of the Mississippi Constitution. ***Miranda v. Arizona***, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 707 (1966). Such a violation of a fundamental constitutional guarantee mandates suppression of his statements.

¶59. Contrary to the special concurrence, egregious police or prosecutorial misconduct is not required for a confession to be rendered inadmissible. The inquiry is simply whether the person was compelled to incriminate himself. ***Malloy v. Hogan***, 378 U.S. 1, 7, 84 S. Ct. 1489, 1493, 12 L. Ed. 2d 653, 659 (1964). According to the United States Supreme Court, "the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was 'free and voluntary': that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, *however slight*, nor by the exertion of any *improper influence*. . . . ." ***Id.*** (emphasis supplied) (quoting ***Bram v. U.S.***, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187, 42 L. Ed. 568, 573 (1897) and citing ***Smith v. United States***, 348 U.S. 147, 150, 75 S. Ct. 194, 196, 99 L. Ed. 192, 197 (1954); ***Wan v. United States***, 266 U.S. 1, 14, 45 S. Ct. 1, 2, 69 L. Ed. 131 (1924);

31

*Hardy v. United States*, 186 U.S. 224, 229, 22 S. Ct. 889, 891, 46 L. Ed. 1137, 1140 (1902)).

The Court illustrated further by noting, "[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." *Id.* (citing *Haynes v. Washington*, 373 U.S. 503, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963)).

¶60.     In *Holland v. State*, 587 So. 2d 848, 859-60 (Miss. 1991), this Court set out the proper standard for reviewing the validity of *Miranda* waivers:

> When validity of a confession is challenged on appeal, an initial inquiry must be conducted. This Court must determine whether the trial judge applied proper legal standards in his evaluation of facts. For example, *the judge must have required the State to prove "all facts prerequisite to admissibility beyond a reasonable doubt."* If the judge applied the proper standards, then this Court must determine from a review of the entire record whether the fact-finding is supported by *substantial evidence*. If the judge applied proper legal standards and his factfinding is supported by substantial evidence, then this Court may not disturb his decision to validate the confession.

*Holland v. State*, 587 So. 2d 848, 855 (Miss. 1991) (internal citations omitted) (emphasis supplied).

¶61.     The Court of Appeals correctly held that whether there was a voluntary, intelligent, and knowing waiver requires a totality-of-the-circumstances test. *Edmonds*, at ¶ 18 (citing *Dancer v. State*, 721 So. 2d 583, 587 (Miss. 1998), and *Fare v. Michael C.*, 442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)). The opinion correctly cites this Court's adoption of the U.S. Supreme Court's opinion in *Fare* for the proposition that this approach is the same used to examine adult waivers. However, not considering the remainder of the *Fare* passage results in a failure to inquire into the relevant factors *particular to juvenile confessions*.

32

> We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits -- indeed, it *mandates* -- inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the *juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.*

*Fare*, 442 U.S. at 725 (citing *North Carolina v. Butler*, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)(emphasis supplied). Therefore, when reviewing juveniles' waivers of the right against self-incrimination and right to counsel, this Court is required to consider factors unique to children.

¶62. In applying the *Fare* factors, there is no "substantial evidence" in the record that indicates the State proved "all facts prerequisite to admissibility beyond a reasonable doubt." *Holland*, 587 So. 2d at 855. Most importantly, at the time Tyler was questioned, neither he nor his mother was informed that there were charges against him. According to the interrogating officer's testimony, Tyler was never even told that he was a suspect. Tyler could not have understood the nature of the charges against him or the consequences of waiving his Fifth Amendment constitutional rights if he was never told that he was suspected of murder. Accordingly, Tyler could not have made the appropriate waiver under *Miranda*'s standards, as he was not even charged with a crime.

¶63. Other factors weigh in favor of suppression. First, Tyler was thirteen years old, the youngest age at which a child may be prosecuted as an adult in Mississippi. Second, while Tyler was an honor student, he had only completed the sixth grade. Third, Tyler had never

been disciplined at school, much less questioned by the police for murder. This Court often considers an individual's criminal history indicative of a knowing waiver, but Tyler had absolutely no experience with law enforcement. *See, e.g.,* **Morgan v. State**, 681 So. 2d 82, 88 (Miss. 1996) (waiver valid where defendant "had a history of legal problems and has had an opportunity to become familiar with the criminal justice system"); **Blue v. State**, 674 So. 2d 1184, 1203 (Miss. 1996) (valid waiver where defendant had been advised of his rights on at least five previous occasions). Fourth, after examining Tyler, the court-appointed psychiatrists found:

> [He] is less mature emotionally and psychologically than he is intellectually. . . . Mr. Edmonds appears to have greater emotional needs for the approval of adults than most adolescents of his chronological age. Because of this, he tends to idealize adults whom he perceives as being kindly disposed toward him, and appears to be more easily influenced by adult authority figures than most adolescents. Finally, despite his above average intellectual and verbal abilities, Mr. Edmonds does not appear to be at all "street smart." This naivete also contributes to his tendency to be influenced by, and to attempt to please others, especially adults.

¶64. Finally, there was ample evidence to demonstrate that Tyler was trying to spare his sister the death penalty by confessing to the murder. Indeed, the interrogating officers exploited this by bringing his sister into the room to confront her little brother. The Third Circuit has held that "confronting a suspect with his alleged partner in crime and the fact that the partner has confessed is precisely the kind of psychological ploy that *Innis*'s definition of interrogation was designed to prohibit." **Nelson v. Fulcomer**, 911 F.2d 928, 935 (3d Cir. 1990). When Kristi confronted Tyler in the interrogation room, she was asking him to waive his constitutionally guaranteed right to silence. Even if Tyler understood his rights, it is

34

highly unlikely that a naive, thirteen-year-old child would disobey three adults including two police officers and his beloved sister.

¶65. In finding Tyler's confession voluntary, the trial court, and subsequently the Court of Appeals, relied heavily on the fact that he had signed a *Miranda* waiver form. However, signing a waiver does not automatically make the subsequent statements voluntary, knowing or intelligent. As this Court held in *Neal v. State*, 451 So. 2d 743, 753 (Miss. 1984),

> [T]he mere giving of the Miranda warnings, no matter how meticulous, no matter how often repeated, does not render admissible any inculpatory statement thereafter given by the accused . . . . When an accused makes an in-custody inculpatory statement without the advice or presence of counsel, even though warnings and advice regarding his privilege against self-incrimination have been fully and fairly given, the State shoulders a heavy burden to show a knowing and intelligent waiver.

Because the State failed to meet this heavy burden, Tyler's confession was involuntary and is inadmissible as a violation of Article 3, Section 26 of the Mississippi Constitution and the Fifth Amendment to United States Constitution.

### IV. The Jury Was Improperly Informed of the Mandatory Life Sentence.

¶66. Before trial, the judge ruled that the defense could not mention to the jury that a guilty verdict would automatically require a life sentence. However, during voir dire, the trial judge made it clear that Tyler could not receive the death penalty: "He is not old enough by law to receive the death penalty. Do you understand that? This is not a death penalty case . . . [t]his charge is commonly known as capital murder. Does everybody understand this is not a case where capital punishment is being sought?"

35

¶67.   The Court of Appeals found that it was not error to prohibit the defense from informing the jury of the mandatory life sentence. *Edmonds* at ¶¶ at 86-90.  The court relied on *Thomas v. State*, 818 So. 2d 335, 348 (Miss. 2002), which held that there was no error in refusing to inform the jury of a mandatory sentence.  In *Thomas*, this Court went on to say, "[t]he problem with arguments such as these is that they invite the jury to convict with regard to the punishment, not with regard to the evidence before them, and the jury should not have been concerned with the quantum of punishment to be imposed." *Id.* at 347-48 (quoting *Marks v. State*, 532 So. 2d 976, 983 (Miss. 1988)).

¶68.   However, because this prohibition applies equally to the trial judge, it was improper to continually remind the jury that Tyler could not receive the death penalty. *Warren v. State*, 336 So. 2d 726 (Miss. 1976); *Smith v. State*, 288 So. 2d 720, 722 (Miss. 1974).  In *Warren*, we held that it was reversible error for the trial judge to instruct the jury as to the minimum and maximum penalties for manslaughter.  336 So. 2d 726.  In reversing a similar case, the Court explained,

> The sole duty of the jury was to pass on the guilt or innocence of the accused. The jury was not concerned in any way with the punishment to be meted out, and it was error to so instruct it as to what the sentence could be. The duty of sentencing the accused was that of the trial judge alone, uninfluenced by any consideration except that of meting out a fair and proper sentence under the circumstances of the particular case.

*Smith v. State*, 288 So. 2d at 722.

¶69.   By instructing the jury that Tyler could not receive the death penalty, the judge conferred an improper benefit on the prosecution.  As Tyler noted in his brief, "[t]his made

the jury more likely to convict because they knew on the one hand that he would not receive the death penalty, but on the other hand, they were free to imagine he might get some lighter sentence or the circumstances of the case might be taken into account in deciding on the proper sentence."

### V. Tyler Was Improperly Denied Bail.

¶70. A trial court's denial of bail is not grounds for reversal of the judgment against a defendant. *Benson v. State*, 551 So. 2d 188, 194-95 (Miss. 1989). However, it is important to address the issue so that what happened in Tyler's first trial is not repeated on remand.

¶71. Three times Judge Kitchens refused to grant Tyler bail based solely on the gravity of the offense, and each time this Court denied Tyler's M.R.A.P. Rule 9 motion to reconsider. Tyler also sought relief in the federal courts by filing a habeas corpus petition. Judge Mills of the Northern District Court granted Tyler's petition and ordered a bail hearing, requiring the State to show a compelling state interest outweighing his right to bail. *Edmonds v. Sheriff of Oktibbeha Cty.*, No. 1:04CV15 (N.D. Miss. Mar. 2, 2004). The Fifth Circuit Court of Appeals ultimately vacated the district court's order because Tyler had not exhausted his claim in state court. *Sealed Appellee v. Sealed Appellant*, No. 04-60176 (5th Cir. Jul. 2, 2004) . Judge Charles Pickering's specially concurring opinion is noteworthy:

> There are several things about this case that concern me greatly. First, this 13-year-old petitioner was arrested and placed in jail on May 12, 2003. He was scheduled to go on trial for the third time on July 19, 2004. That means this 13-year-old would have been in custody 14 months before he was tried. Secondly, it is inconceivable that the State of Mississippi could not have found some place to incarcerate this young defendant without maintaining him in an adult population for some 14 months before trial. Particularly is this true in view of

37

the fact that the court, *sua sponte*, appointed two experts to evaluate the 13-year-old and found that his mental abilities were declining during his incarceration, and then, for reasons that are unclear, ordered that these two experts were not available to either side as witnesses. . .*Without question, it was the State of Mississippi that was holding this 13-year-old before trial. . . . Petitioner has raised serious constitutional issues about the incarceration of a 13-year-old held some 14 months before trial.*

*Id.* (Pickering, J., specially concurring) (emphasis supplied).

¶72.     Article 3, Section 29 of the Mississippi Constitution states, "(e)xcessive bail shall not be required, and all persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses (a) when the proof is evident or presumption great . . . ."  Though the U.S. Supreme Court has not determined whether the right to non-excessive bail is fundamental and, therefore, applicable to the states through incorporation in the Fourteenth Amendment due process clause, the federal government has taken a similar approach to the Eighth Amendment.  In **Stack v. Boyle**, 342 U.S. 1, 72 S. Ct. 1, 96 L. Ed. 3 (1951), the Supreme Court held that there is a federal constitutional right to non-excessive bail in non-capital cases.

¶73.     The issue raised in Tyler's case is whether he has been charged with a "capital offense" despite the fact that as a juvenile he cannot be given the death penalty.  **Roper v. Simmons**, 543 U.S. 551, 568, 125 S. Ct. 1183, 1194, 161 L. Ed. 2d 1, 21 (2005) (Eighth Amendment prohibits imposition of death penalty on juvenile offenders under eighteen); **Thompson v. Oklahoma**, 487 U.S. 815, 832, 108 S. Ct. 2687, 2697, 101 L. Ed. 2d (1988) (Eighth Amendment prohibits imposition of death penalty on juvenile offenders under sixteen).  The district court examined Mississippi case law and correctly concluded that for purposes of

Article 3, Section 29, Tyler was not charged with a "capital" offense. ***Edmonds v. Sheriff***, at 9.[4]

¶74.   In reaching this conclusion, Judge Mills looked to two decisions by this Court during the few years the U.S. Supreme Court completely abolished the death penalty. *See **Furman v. Georgia***, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).   He first examined our decision in ***Hudson v. McAdory***, 268 So. 2d 916 (Miss. 1972) where we addressed the meaning of "capital" for Section 29 purposes where the death penalty could no longer be imposed.   The Court determined that "capital offenses" meant "a class of cases where the Legislature has authorized the infliction of the death penalty," regardless of whether the death sentence could actually be carried out if the defendant was convicted.  ***Id.*** at 922.   This decision was reached to avoid confusion over statutes which referred to "capital crimes." ***Id.*** at 922-23.

¶75.   After the death penalty was reinstated, this Court was again asked to examine the meaning of "capital offenses" in ***Ex parte Dennis***, 334 So. 2d 369, 372 (Miss. 1976).   Judge Mills wrote:

---

[4]The Fifth Circuit disagreed, stating that "Petitioner's offense is 'capital' for purposes of obtaining bail under Mississippi law." ***Sealed Appellant*** at 2.  However, a few sentences later, the court states, "[t]hat question of Mississippi law is not before us." ***Id.*** at 3.  Indeed, Tyler's petition was dismissed on other grounds, thus the Fifth Circuit had no reason to examine Mississippi law on that issue.  Moreover, the Fifth Circuit opinion examined federal case law interpreting the Eighth Amendment to the U.S. Constitution.  As stated above, the Eighth Amendment right to non-excessive bail has not been incorporated to the states via the Fourteenth Amendment and is therefore not applicable.

> [I]n ***Ex Parte Dennis***, the Mississippi Supreme Court clarified its holding in ***Hudson*** and reiterated the "historic definition of a capital case as one permitting the death penalty." 334 So. 2d 369, 372 (Miss. 1976). The ***Dennis*** Court also interpreted Miss. Code Ann. § 1-3-4 in light of the Mississippi Constitution, reasoning that, while the legislature could define "capital by statute as carrying the penalty of death or life imprisonment, this statutory definition did not change the meaning of the word as it was used in § 29 of the State Constitution. ***Id.*** at 372-73 (holding that armed robbery suspect was entitled to bail hearing, even though armed robbery was considered "capital" offense under Mississippi law because maximum sentence was life imprisonment). Finally, the ***Dennis*** Court characterized the whole conflict over the meaning of "capital" in the state constitution as being an "ambiguity," resulting from ***Furman***'s temporary abolition of the death penalty, which was removed by the post-***Furman*** death penalty statute which passed constitutional muster. ***Id.*** at 373.

***Edmonds v. Sheriff*** at 4-6. The court went on to conclude that because Tyler could not face the death penalty, he was not charged with a "capital" offense for purposes of § 29. ***Id.*** at 9. Therefore, the district court found that the nature of the offense was not sufficient grounds for denying bail.

¶76.    This approach to Section 29 is supported by the rule in this state that "the purpose of bail is to secure the presence of the accused at trial." ***Clay v. State***, 757 So. 2d 236, 241 (Miss. 2000) (citing ***Lee v. Lawson***, 375 So. 2d 1019, 1021 (Miss. 1979)). Capital cases are treated differently by the federal government and most states because, as Judge Mills reasoned, "arguably no amount of bail would be sufficient to guarantee the presence at trial of someone facing a death sentence." ***Edmonds v. Sheriff*** at 10 (citing ***Stack*** 342 U.S. at 4-5, 72 S. Ct. at 3-4). Because Tyler could not face the death penalty, there was not the heightened risk of flight associated with "capital" offenses under Section 29. Therefore, Tyler had a

40

"fundamental, constitutionally protected right" to bail. ***Resolute Ins. Co. v. State***, 233 So. 2d 788, 789 (Miss. 1970).

¶77.   Tyler's offense also falls under the plain language of art. 3, § 29(3):

> In the case of offenses punishable by imprisonment for a maximum of twenty (20) years or more or ***by life imprisonment***, a county or circuit judge may deny bail for such offenses when the proof is evident or the presumption great upon making a determination that the release of the person or persons arrested for such offense would constitute a special danger to any other person or to the community or that no condition or combination of conditions will reasonably assure the appearance of the person as required.

Miss. Const. art. 3 § 29(3) (emphasis supplied).  Accordingly, the State was required to prove that Tyler constituted a danger to the community or another person or that there was a substantial risk of flight.  At no point did the State produce a scintilla of evidence of either.  On the other hand, numerous teachers, members of the community, and even the Sheriff of Oktibbeha County testified that Tyler was not a danger to the community or even a violent person.  He had never even been disciplined at school.  Additionally, it is difficult to imagine a thirteen-year-old having the ability to flee when his entire family resides in Mississippi.

¶78.   Unfortunately, like *many* other instances in this case, Tyler was arbitrarily denied the constitutionally-guaranteed protections of the law.

**GRAVES, J., JOINS THIS OPINION.**

**RANDOLPH, JUSTICE, SPECIALLY CONCURRING:**

¶79.   I concur with Presiding Justice Waller's majority opinion for the Court and agree with Justice Easley's excellent analysis in Parts I and III of his dissent.  However, I am unable to

41

join Justice Easley's dissent as it would result in an affirmance of the conviction. I do not join Justice Diaz's separate opinion and write separately to express my views regarding the admissibility of Tyler's confession.

¶80. The separate opinion authored by Justice Diaz (1) fails to focus on the necessary area of judicial inquiry regarding Tyler's undisputed confession, i.e. *police or alleged prosecutorial* misconduct, and (2) improperly suggests a legal requirement for the presence of Sharon Clay, Tyler's mother, during questioning. Here we must set aside parental empathy and emotion and objectively determine whether *the State* defied, ignored, or trampled upon the safeguards provided to criminal defendants, be it through our constitution, statutes, or case law.

¶81. Before I begin this arduous task, I recognize that this Court must be highly deferential to the conclusions on admissibility rendered by the trial court. *See Dancer v. State*, 721 So. 2d 583, 587 (Miss. 1998). Substantial, credible evidence fills the record, reflecting that the trial court properly decided that Tyler's confession was "intelligently, knowingly and voluntarily given, and not a product of *police* threats, promises or inducements." *Wilson v. State*, 936 So. 2d 357, 361 (Miss. 2006) (emphasis added).

¶82. According to Deputy Tommy Whitfield of the Oktibbeha County Sheriff's Department, Kristi Fulgham gave her statement to Chief Deputy Scotty Carrithers between 4:30 p.m. and 5:30 p.m. on May 12, 2003.[5]

---

[5]The following testimony and evidence was provided to the trial court at the suppression hearing regarding the circumstances surrounding Tyler's confession.

¶83.  Around 5 p.m., Tyler Edmonds's mother, Sharon Clay, learned from Kristi's friend Sonya Upchurch "that the sheriff's office was looking for Tyler." According to Deputy James Lindsey of the Oktibbeha County Sheriff's Department, at approximately 5:30 p.m., Clay called and was told that "we needed to talk to him and if she would to bring him to the sheriff's department." Clay decided to comply with the request and brought Tyler to the sheriff's department to take a statement.

¶84.  At approximately 6:23 p.m., Tyler was read his *Miranda* rights, which he stated that he understood. Tyler then signed the rights waiver form, and Clay signed the form as a witness.[6] Thereafter, Lindsey and Whitfield began taking Tyler's statement, with Clay present, in Lindsey's office.[7] In this initial statement, according to Lindsey, Tyler "said that he had picked up a gun from his residence to . . . shoot a dog" and "stated that before they left [for the Gulf Coast] that they went to Joey's bedroom and told him bye and said Joey raised his hand up and waved and said something, but he didn't understand what he said." This concerned the deputies because "Kristi had already told us that Joey was dead before they had left[,] so we knew he wasn't being up-front with us about what had transpired[,] so we continued going round and round are you sure he was dead . . . ." Up until this point, Clay was present in the room with Tyler. According to Whitfield, she continuously interfered with

---

[6]Clay alleges that she signed the rights waiver form "saying that they could talk to him with the stipulation that I be present." She later admits this was only verbalized, not formally documented.

[7]At this point, Lindsey was aware of the statements made by Kristi in her interview with Carrithers.

43

the interview by "taking up for Tyler saying that . . . if her son had been involved in something like this, she would have known about it." Whitfield then asked Clay "if she believed that it would be better if we talked to Tyler outside of her presence. She kept going no. If something had happened, I would have known about it, and I would really like to be there if y'all talk to him . . . ."

¶85. Thereafter, according to Whitfield, Sheriff Dolph Bryan:

> told us to go ahead and start questioning him outside the presence of the mother. I took the mother out of the room and took her into the lobby of the sheriff's office and basically told her that I did not think Tyler was being honest with us; that his story wasn't adding up; that with the events that were going on he was backing us basically into a corner and it just wasn't the truth.

This conversation was substantially corroborated by Clay. Moreover, Sheriff Bryan stated that, "I told them to get the mother out of the room; that *this case didn't come under the purview of the youth court and they could question him without his mother being present*." (Emphasis added). In the hallway, Whitfield "asked [Clay's] opinion if she thought that she may be hampering – he may not want to talk in front of her, and if he would talk away from her, did she think he would be more open to talking." In response, Clay "went back to the same thing that this was her baby. If he had been involved in something, she would know about it and that he would have told her or she would have known."

¶86. With Clay and Whitfield in the hallway, Lindsey "spoke to Tyler and told [him] that Kristi had told in her statement that he was the one that killed Joey." Tyler allegedly told Lindsey "that he didn't believe me; that he didn't believe that Kristi told me that. . . . I said, [w]ell, would you believe her if she told you that? He said, [y]es, because I don't lie to her

44

and she don't lie to me." The length of the Whitfield-Clay and Lindsey-Tyler interactions lasted approximately thirty minutes, according to Clay. Tyler then joined Clay in the break room for the next thirty minutes.

¶87. While Tyler was in the break room, Lindsey "walked back outside and talked to Kristi and I told her that Tyler didn't believe that she had told us that, and I asked her if she would tell Tyler what she had told in her statement and she said yes." According to Lindsey, he did not tell Tyler that he did not believe him, nor did he ask Kristi to go in and tell Tyler to confess or to tell the truth, he "*just asked Kristi if she would go in and tell Tyler what she had told in her statement*; that he thought we were lying to him." (Emphasis added). In so doing, he "mainly wanted Tyler to know that she was saying that he was the one that killed Joey."

¶88. According to Clay, Carrithers then came into the break room, "grabbed Tyler by the arm[,] and said, [w]e'll be back in a minute." Thereafter, Tyler, Kristi, Lindsey, Whitfield, and Carrithers went into Lindsey's office.[8] According to Lindsey, in the lone twenty-second interaction between Kristi and Tyler, "she walked in and sat down, she told Tyler to hold her hand and they held hands and she told Tyler, she said, [y]*ou need to tell them what happened. I've already told them and they know what happened and you need to tell them the truth*." (Emphasis added). Clay was not aware of Tyler being put in the same room with Kristi.

¶89. Lindsey and Officer Shannon Williams then brought Tyler into the assistant supervisor's room, where the videotaped statement was taken. At 8:30 p.m., approximately

---

[8]Officer Shannon Williams was standing in the doorway.

twenty minutes after Tyler spoke with Kristi, his videotaped statement commenced. According to Lindsey, he "read [Tyler] his rights one time without the video and then we did it also again on the video." Lindsey insisted that neither he nor Williams made "any promises, threats, or anything to Tyler Edmonds in order for him to waive his rights."[9] Lindsey further stated that at no point did Tyler invoke his right to remain silent, and, in fact, "said he wanted to tell the truth and he had to tell the truth." Additionally, he told Lindsey and Williams that "he would rather talk to us without his mother being present" and that "he would talk to her after we got through . . . ." Tyler gave his incriminating statement at approximately 9:30 p.m.. When Clay entered the room, Tyler then told her that he and Kristi had killed Joey. Specifically, as noted by the Court of Appeals in its opinion, 2006 Miss. App. LEXIS 311 at *13-15, the record reflects the following exchange:

BY DEFENDANT'S MOTHER: Tyler, --

BY OFFICER WILLIAMS: Do – do you want him to stop talking to us? Do y'all want to –

BY DEFENDANT'S MOTHER: I want to be here with him. This is my child. You have to understand.

BY OFFICER WILLIAMS: And he – he said prior that he – he wants to talk to you after he talks to us.

---

[9]This is corroborated by Officer Williams and Sheriff Bryan. Deputy Lindsey further denied making any promises, inducements, or threats to Kristi or Tyler in exchange for talking. Even Clay admits that Tyler never told her he did not want to talk or that he wanted to invoke his right to remain silent. Furthermore, Tyler never told Clay that he was threatened, intimidated, or promised anything, nor did she ever personally see him threatened.

46

BY DEFENDANT'S MOTHER: Tyler, do you know what you're – I mean you're telling them the truth. Right?

BY THE DEFENDANT: (Head nodding yes)

BY DEFENDANT'S MOTHER: Huh?

BY OFFICER WILLIAMS: And he wants – and he wants to talk to you after he talks to us.

BY DEFENDANT'S MOTHER: They're not making you say stuff that you don't want to say?

BY THE DEFENDANT: (Head nodding no)

BY DEFENDANT'S MOTHER: Look at me. Look at me. Are you having problems?

BY THE DEFENDANT: (Head nodding no)

BY DEFENDANT'S MOTHER: Well what's wrong?

BY OFFICER WILLIAMS: Do you want to go ahead and talk to her now, Tyler?

BY THE DEFENDANT: (Head nodding no)

BY DEFENDANT'S MOTHER: Do you? Son, just – Look, baby, tell me. Look. What's wrong? What's wrong, baby, Huh?

BY THE DEFENDANT: *I'm telling the truth*.

BY DEFENDANT'S MOTHER: Okay. *What is the truth*?

BY THE DEFENDANT: *That me and Christy did it*.

BY DEFENDANT'S MOTHER: Tyler, y'all killed him.

(DEFENDANT CRYING)

BY DEFENDANT'S MOTHER: Tyler! Tyler Wayne! Son look at me. Did you for real do that or are you just telling them that.

BY THE DEFENDANT: *We done this*.

BY DEFENDANT'S MOTHER: What did y'all do? Oh, God . . . Tyler Wayne, are you sure you did this?

BY THE DEFENDANT: Yes, Ma'am.

BY DEFENDANT'S MOTHER: Tyler, do you know what that means?

BY THE DEFENDANT: Yes, ma'am, momma.

BY DEFENDANT'S MOTHER: What – Tyler, what is going on?

BY THE DEFENDANT: *She made me do it*.

(Emphasis added).

¶90. Furthermore, two days later on May 14, 2003, Tyler called the home of Marcus Sullivan, the father of one of Tyler's friends, seeking to get in touch with his mother. In that conversation, Sullivan claims that "[Tyler] asked had I heard about Joey and I said I had. There was a pause and I asked him, [d]id you do it? He said, [y]es, sir."

¶91. On October 17, 2003, the "Order and Opinion" of the Circuit Court of Oktibbeha County provided:

> [a]fter . . . hearing testimony, reviewing evidence and listening to the arguments of counsel, the Court finds *beyond a reasonable doubt* that the Defendant's statements of May 12, 2003, were *knowingly, intelligently, freely and voluntarily given and were not the product of coercion, threats, inducements or offers of reward*. Moreover, the Court so finds that the statements were not the product of any type of intoxication. Therefore, the Defendant's Motion to Suppress is overruled.

48

(Emphasis added).[10]

¶92. The standard of review regarding the admissibility of a confession against a defendant is "confined to . . . established limits." *Dancer*, 721 So. 2d at 587. In *Dancer*, this Court stated:

> [i]n *Alexander v. State*, 610 So. 2d 320 (Miss. 1992), we set out those limits:
>
>> This is essentially a *fact-finding function*. So long as the court applies the *correct legal standards*, "we will *not* overturn a finding of fact made by a trial judge *unless* it be *clearly erroneous* [*or contrary to the overwhelming weight of the evidence*]."
>
> *Alexander*, 610 So. 2d at 326 (citations omitted). Where, on conflicting evidence, the lower court admits a statement into evidence this Court *generally must* affirm. *Morgan* [*v. State*, 681 So. 2d 82,] 87 [(Miss. 1996)]; (citing *Alexander*, 610 So. 2d at 326); *McGowan v. State*, 706 So. 2d 231, 235 (Miss. 1997).

721 So. 2d at 587 (emphasis added).

¶93. The test for the admissibility of a confession was set forth in *Wilson*, as follows:

> for a confession to be admissible at trial it must have been *intelligently, knowingly and voluntarily given, and not a product of police threats, promises or inducements*. *Manix v. State*, 895 So. 2d 167, 180 (Miss. 2005). In determining whether a defendant's confession was intelligently, knowingly and voluntarily given the *trial court* sits as a *finder of fact*. *Glasper v. State*, 914 So. 2d 708, 716 (Miss. 2005). Therefore, this Court will *reverse* the trial court's determination *only when* it was *manifestly incorrect*. *Id*. A confession is *voluntary when*, taking into consideration the *totality of the circumstances*, the *statement is the product of the accused's free and rational choice*. *Jacobs*

---

[10]On October 8, 2004, in its "Order Denying Motion for New Trial or Directed Verdict," the Circuit Court of Oktibbeha County stated that it "stands by its October 2003 ruling, finding *beyond a reasonable doubt* that Edmonds' confession of May 12, 2003, was *knowingly, voluntarily and intelligently given*." (Emphasis added).

*v. State*, 870 So. 2d 1202, 1207 (Miss. 2004). The prosecution bears the burden of showing beyond a reasonable doubt that the confession was voluntary. *Glasper*, 914 So. 2d at 717; *Manix*, 895 So. 2d at 180.

936 So. 2d at 361-62 (emphasis added). *See also **Dancer***, 721 So. 2d at 587 ("for a confession to be admissible it must have been given voluntarily and not given because of promises, threats or inducements. ***Morgan***[, 681 So. 2d at 86] (citing ***Chase v. State***, 645 So. 2d 829, 838-39 (Miss. 1994)). 'The prosecution shoulders the burden of proving beyond a reasonable doubt that the confession was voluntary.' ***Morgan***, 681 So. 2d at 86 (citing ***Haymer v. State***, 613 So. 2d 837, 839 (Miss. 1993)). This 'burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward.' ***Morgan***, 681 So. 2d at 87 (quoting ***Chase***, 645 So. 2d at 838) (quoting ***Cox v. State***, 586 So. 2d 761, 763 (Miss. 1991)).").

¶94.    The United States Supreme Court, seventeen years after ***Gallegos***, applied the "totality of circumstances approach" in evaluating the interrogation of a minor, stating:

> [w]e discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits – indeed, it mandates – inquiry into all the circumstances surrounding the interrogation. This *includes evaluation of* the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

***Fare v. Michael C.***, 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197, 212 (1979) (emphasis added). That "totality of circumstances approach" in evaluating the interrogation

50

of a minor has been adopted by this Court. *See Woodham v. State*, 779 So. 2d 158, 161 (Miss. 2001); *Clemons v. State*, 733 So. 2d 266, 269 (Miss. 1999); *Dancer*, 721 So. 2d at 587 ("[w]hether there was an intelligent, knowing and voluntary waiver is essentially a factual inquiry to be determined by the trial judge from the totality of the circumstances.").

¶95.    As a preliminary matter, the Youth Court Act is inapplicable here, as recognized by Sheriff Bryan.  Every relevant individual (Tyler, Clay, and Kristi) recognized that the Oktibbeha County Sheriff's Department was investigating the murder of Joey Fulgham.  That crime plainly fits within the jurisdictional purview of the circuit court, not the youth court. *See* Miss. Code Ann. § 43-21-151(1)(a) (Rev. 2004) (gives the circuit court original jurisdiction in cases involving "[a]ny act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death . . . .").[11]  Moreover, in *Clemons* this Court reiterated that in crimes where the circuit court has original jurisdiction, "age had no special bearing on [the child's] ability to be questioned without a parent and voluntarily waive his rights."  733 So. 2d at 270 (quoting *Blue v. State*, 674 So. 2d 1184 (Miss. 1996)).  Therefore, the fact that Tyler was interviewed outside his mother's presence does not render his confession involuntary and is, under our law, permissible.

---

[11]While this case could have been transferred to the youth court by the circuit court under Miss. Code Ann. § 43-21-151(4) (Rev. 2004), the trial judge found that the interests of justice necessitated that the case stay within the jurisdiction of the circuit court.  As such, Miss. Code Ann. § 43-21-303(3) is inapplicable.

¶96. According to the suppression hearing testimony of Clay, Tyler is a "book smart" young man who gets "A's" and "B's" at school and participated in the "gifted program." On three separate occasions, Tyler was read his rights. Each time he stated that he understood them and chose to waive them, at one point allegedly stating that "he had to tell the truth." As was the case in *Fare*, "[t]here is no indication that he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be." 442 U.S. at 726. Furthermore, Tyler, his mother, and the staff at the Oktibbeha County Sheriff's Department consistently maintain that Tyler was in no way threatened, promised, or induced by the police to confess.

¶97. The separate opinion of Justice Diaz concludes that the influence Kristi had over Tyler effectively rendered this confession coerced and inadmissible. That proposition fails for three distinct reasons. First, the interaction between Kristi and Tyler was so brief and benign that it strains reason to conclude that it rendered Tyler's subsequent confession involuntary and, therefore, inadmissible. The encounter between Kristi and Tyler arose after Deputy Lindsey told Tyler that Kristi had told them he killed Joey. After Tyler refused to believe Deputy Lindsey, he asked Kristi if she "would tell Tyler what she had told in her statement . . . ." In their twenty-second interaction, Kristi sat down, held Tyler's hand, and told him "[y]ou need to tell them what happened. I've already told them and they know what happened and you need to tell them the truth." That was the entire substance of the conversation, "tell them the truth." This action hardly rises to the egregious levels deplored by the United States Supreme Court in *Haley*, 332 U.S. at 596, and *Gallegos*, 370 U.S. at 49, and therefore, renders those

52

cases distinguishable.[12]  Second, the alleged overwhelming influence which Kristi had over Tyler was not manifested in the substance of his confessions.  As aptly pointed out in the Court of Appeals' majority opinion authored by Judge Irving:

> [i]t is ironic that Edmonds maintains that Kristi pressured him into confessing, while at the same time admitting in his testimony that he did not tell the authorities what Kristi had told him to tell them.  According to Edmonds's trial testimony, Kristi told him to say that he killed Joey and that it was an accident. However, out of a total of three statements, Edmonds never stated that it was an accident, and in the first statement, even denied having any knowledge of the killing until sometime later when people started calling Kristi to tell her that Joey had been found dead.  In the second statement, which was the first videotaped statement, Edmonds still did not say that the killing was an accident. Further, he did not take responsibility alone, as Kristi had instructed him to do. Instead, he implicated her, along with himself.  While they were in jail, Kristi wrote him a letter reminding him that he still had not stated that the killing was an accident.  *If Kristi had applied the pressure that Edmonds would have us believe was applied, at least one of his statements would have been more favorable to her*.

2006 Miss. App. LEXIS 311 at *23-24 (emphasis added).  Third, even assuming arguendo that some evil motive lay beneath the surface of Kristi's request, it is her evil motive, not the State's.  **Wilson** deems a confession inadmissible if "a product of *police* threats, promises or inducements."  936 So. 2d at 361.  Deputy Lindsey testified that he wanted Tyler to hear Kristi's statement from Kristi because he "wanted Tyler to know that she was saying that he

---

[12]**Haley** involved the admissibility of a confession procured by Canton, Ohio, police in 1945 from a fifteen-year-old male where "there [was] evidence that he was beaten[,]" he was questioned in relays of one to two by six separate police officers from midnight to 5 a.m., and he was never advised of his right to counsel.  332 U.S. at 597-98.

    *Gallegos* involved the admissibility of a confession procured from a fourteen-year-old male after a five-day detention during which he was not allowed to have contact with any "lawyer, parent, or other friendly adult."  370 U.S. at 50.

    The case sub judice is in no way comparable to the factual scenarios of those cases.

was the one that killed Joey." He did not ask Kristi to tell Tyler to confess or tell the truth, he only asked her to "tell Tyler what she had told in her statement . . . ." Clearly, no "*police threats, promises or inducements*" were implicated therein.

¶98. Furthermore, Tyler confessed twice more in the two days following his initial confession: once to his own mother, Clay, immediately after she entered into the assistant supervisor's office and a second time to Marcus Sullivan on May 14, 2003.

¶99. I conclude that the trial court clearly did not err in deeming Tyler's confession admissible. Given the deferential standard of reviewing that decision, *see **Dancer v. State***, 721 So. 2d at 587; the opportunity that the jury had, at trial, to weigh the confessions and Tyler's recantation on its own; and our body of law, I conclude that the trial court was eminently correct in allowing the jury to consider the evidence.

**WALLER, P.J., AND CARLSON, J., JOIN THIS OPINION. SMITH, C.J., JOINS THIS OPINION IN PART.**

**EASLEY, JUSTICE, DISSENTING:**

¶100. This case sadly involves an individual who was thirteen years old at the time he murdered his brother-in-law and fifteen years old when he was sentenced to life in prison. Without question, this is a tragic case for everyone involved, especially for Joey Fulgham, who was shot to death in his sleep with a .22 caliber rifle that Tyler Edmonds brought with him at Kristi Fulgham's request. Edmonds was properly tried in the trial court as an adult and should be treated by the courts as an adult for a crime that he confessed, not once but three

54

times, to having committed. It appears that the majority has lost sight of this fact in finding reversible error.

¶101. Besides the confession Edmonds made to law enforcement and his confession to his mother in the presence of law enforcement, Edmonds also voluntarily confessed to Marcus Sullivan, the father of one of Edmonds's friends, that he killed Fulgham. Therefore, Edmonds clearly confessed independent of any alleged police influence or coercion as argued by the defense on appeal. As referenced by the Court of Appeals' majority opinion, the trial record reflects the following exchange:

> Q. Mr. Sullivan, where do you work?
> A. Mississippi State.
> Q. And what do you do for Mississippi State?
> A. Computer programmer.
> Q. Sir, do you know the defendant in this case, Tyler Edmonds?
> A. Yes.
> Q. How is it that you know Tyler Edmonds?
> A. Tyler plays with Chasady. He comes to the house sometimes.
> Q. Did you know Tyler Edmonds back in May of 2003, sir?
> A. Yes.
> Q. Let me take you back to the night of Wednesday, May 14th, 2003. That's the Wednesday night following Mother's Day. Do you recall that night, sir?
> A. Yes.
> Q. At that time were you aware - - well, let me ask you this. Did you know who Joey Fulgham was?
> A. No, sir.
> Q. Were you aware that there was an individual named Joey Fulgham who had been murdered over here in Oktibbeha County?
> A. Yes.
> Q. Were you aware that this defendant, Tyler Edmonds, had been charged with the murder of Joey Fulgham?
> A. Yes.
> Q. On that night, on that Wednesday night - - well, had you been to work that day, sir?

55

A.      Yes, sir.

Q.      Once you returned home that Wednesday night, did you ever have occasion to speak by telephone with this defendant, Tyler Edmonds?

A.      Yes, sir.

Q.      Would you please tell the ladies and gentlemen of the jury how it was that that [sic] happened?

A.      Tyler called the house and I was the only one home and he wanted me to get in touch with his mother. He had been trying to call his mother's house and there was no answer, and he asked had I heard about Joey, and I said I had. There was a pause and I asked him, Did you do it? He said, Yes, sir.

Q.      You asked him point blank, Did you kill Joey Fulgham?

A.      I asked him, Did you do it?

Q.      And what was his response, sir?

A.      Yes, sir.

***Edmonds v. State***, 2006 Miss. App. LEXIS 311, 15-6 (Miss. Ct. App. Apr. 25, 2006)

¶102. The Court of Appeals, in its 6-2 judgment, affirmed Edmonds's conviction and sentence, thereby finding no reversible error. After reviewing the record, I find that the Court of Appeals was correct in its reasoning and its judgment to affirm the conviction and sentence.

¶103. As I would affirm the conviction and sentence, I write separately to address the three assignments of error raised by Edmonds in his petition for writ of certiorari, which are as follows: (1) whether the trial court properly refused the expert testimony of Dr. Allison Redlich on the subject of false confessions after conducting an extensive ***Daubert*** hearing, (2) whether the State's forensic pathologist, Dr. Steven Hayne, testified outside of his area of expertise, and (3) whether the trial court erred in refusing to allow the introduction of Edmonds's recanted confession.[13] While I defer to the Court of Appeals' thorough judgment

---

[13] ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

as to the other issues which were raised by Edmonds at the Court of Appeals but not raised by Edmonds on certiorari to this Court, I will also briefly examine the excluded hearsay which the majority opinion has chosen to address. *See Edmonds v. State*, 2006 Miss. App. LEXIS 311 (Miss. Ct. App. Apr. 25, 2006).

### I. Dr. Allison Redlich

¶104. I fully agree with the majority's finding that the trial court did not abuse its discretion in excluding Dr. Redlich's testimony. However, I write separately to elaborate on my reasons for finding that Dr. Redlich's testimony was properly excluded. When reviewing the admissibility of evidence, this Court has employed an abuse of discretion standard of review. In *Shaw v. State*, 915 So. 2d 442, 445 (Miss. 2005), this Court held:

> Our standard of review for the admission or exclusion of evidence is very familiar. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Jefferson v. State*, 818 So. 2d 1099, 1104 (Miss. 2002) (quoting *Fisher v. State*, 690 So. 2d 268, 274 (Miss. 1996)). *See also Hill v. State*, 774 So. 2d 441, 444 (Miss. 2000); *Crawford v. State*, 754 So. 2d 1211, 1215 (Miss. 2000); *Gilley v. State*, 748 So. 2d 123, 126 (Miss. 1999); *Hughes v. State*, 735 So. 2d 238, 269 (Miss. 1999).

¶105. The Court of Appeals provided a well-reasoned analysis of M.R.E. 702, *Daubert*, and our holding in *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003), which adopted *Daubert* as the standard for the admission of expert testimony in Mississippi. The Court of Appeals stated:

> The *Daubert* court described the analysis that judges must apply when determining admissibility as a two-step inquiry: "the trial judge must determine at the outset. . . whether the expert is proposing to testify to (1) scientific

knowledge [reliability] that (2) will assist the trier of fact to understand or determine a fact in issue [relevance]." *Id*. In answering this inquiry, *Daubert* urged courts to use a non-exhaustive list of factors to help determine the admissibility of expert testimony: (1) whether the theory can be, and has been, tested; (2) whether the theory has been published or subjected to peer review; (3) any known rate of error; and (4) the general acceptance that the theory has garnered in the relevant expert community. *Id*. at 593-94.

In further describing the admissibility of expert testimony, the Court emphasized that "the inquiry envisioned by Rule 702 is . . . a flexible one." *Id*. at 594. The Court also stated that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id*. at 592.

Although *Daubert* was decided in 1993, Mississippi did not adopt the *Daubert* standard until 2003, in *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003). Prior to adopting the *Daubert* standard, Mississippi utilized the "general acceptance" standard as articulated in *Frye*. In *McLemore*, the Mississippi Supreme Court adopted *Daubert* because Rule 702 of the Mississippi Rules of Evidence (governing the admissibility of expert testimony) was amended May 29, 2003. The court found that the amended comment "makes no mention of *Frye* or the general acceptance test. Thus, the current version of Rule 702 recognizes that the *Daubert* rule, as modified, provides a superior analytical framework for evaluating the admissibility of expert witness testimony." *Id*. at 39.

In *McLemore*, the Mississippi Supreme Court also provided additional guidance as to the role of the trial court as "gatekeeper": "whether testimony is based on professional studies or personal experience, the 'gatekeeper' must be certain that the expert exercises the same level of 'intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*. at 37-38 (quoting *Kumho Tire*, 526 U.S. at 152). In summary, *McLemore* reiterated that the trial court's job is to perform a two-pronged inquiry: (1) whether the expert's testimony would be relevant, and (2) whether the proposed testimony is reliable. *Id*. at 38 (citations omitted). The court repeated the *Daubert* caution that the determination of whether to allow an expert to testify is "flexible." *Id*. The court also noted that "there is universal agreement that the *Daubert* test has effectively tightened, not loosened, the allowance of expert testimony." *Id*. at 38 (citing *Hammond v. Coleman Co.*, 61 F. Supp. 2d 533, 537 (S.D. Miss. 1999)).

*Edmonds*, 2006 Miss. App. LEXIS 311 at 27-30.

¶106. The Court of Appeals analyzed the trial court's decision to deny the testimony of Dr.

Redlich, concluding that "[a]fter reviewing the court's order, the record, and the relevant case

law, we do not find that the court abused its discretion in rejecting the proposed testimony of

Dr. Redlich." *Edmonds*, 2006 Miss. App. LEXIS 311, 35-6. The Court of Appeals provided

a detailed examination of the trial court's findings as to each of the *Daubert* factors:

> After a day-long, pre-trial *Daubert* hearing on whether Dr. Redlich would be allowed to testify, the trial judge entered an order finding that Dr. Redlich's proposed testimony did "not satisfy the dictates of Mississippi Rule of Evidence 702 and will be excluded." In its order, the court pointed out that "Dr. Redlich admitted that there is no empirical test available to determine whether a confession is truthful or not. Redlich also admitted that the hypothesis of false confessions cannot be tested empirically. Moreover, she could not say that there was a correlation between youth in her test who falsely confessed to hitting the 'Alt' key and youth who falsely confessed to committing various felony crimes." Dr. Redlich testified that it would be impossible to do an empirical test of false confessions because to do so would require taking juveniles to police stations and accusing them of crimes they had not committed. The court found that, overall, "Redlich indicated that there was very little study of false confessions and juveniles." The court then engaged in an application of Redlich's proposed testimony to the *Daubert* factors.
>
> As to the first factor, whether the theory has or can be tested, the trial court accurately found that Redlich herself had already admitted that the theory could not ethically be tested, and therefore would not be tested at all. The court also noted that it "was not able to determine if Redlich's assertion that there is a widespread misconception among the public that persons do not confess falsely unless they have been tortured or abused had been tested or is testable." The court was not required to accept Redlich's mere assertion that there was such a misconception, because "neither *Daubert* nor the Federal Rules of Evidence requires that a court 'admit opinion evidence that is connected to existing data only by the ipse dixit of the expert,' as self-proclaimed accuracy by an expert is an insufficient measure of reliability." *McLemore*, 863 So. 2d at 37 (quoting *Kumho Tire*, 526 U.S. at 157). Although the trial court recognized that the psychology of false confessions is a social science and is

not "Newtonian physics," the court nonetheless found that "nothing in *Daubert* or its progeny hold [sic] that testability should be waived when evaluating the reliability of social science testimony." The court pointed out that "personality inventory tests developed by social scientist [sic] such as the Minnesota Multiphasic Personality Inventory 'MMPI-II' have validity scales and thus, are testable."

In evaluating the second factor, whether the theory has been subjected to peer review and publication, the trial court found that, although there are "a number of publications regarding false confessions. . . . the proponents of the field of expert testimony regarding false confessions appears to be a small group." Specifically, the court noted that the "group" appears to be six people, and there are two people who have attacked the field of false confessions. It is not clear from the court's order that it found that this factor weighed strongly against the admissibility of Dr. Redlich's testimony, but the court clearly questioned the extent and quality of publication and peer review in what it deemed to be an "infant field."

The trial court also found that the third *Daubert* factor, known or potential rate of error, weighed against the admissibility of Dr. Redlich's testimony. As the court pointed out in its order, Dr. Redlich herself testified that there is no way to discern a possible rate of error in the field of false confessions, because the theory cannot ethically be tested. Therefore, the court found that this factor also "militates against admissibility."

In analyzing the final *Daubert* factor, general acceptance in the relevant scientific community, the court looked to how much acceptance the theory had gained in terms of admissibility in other courts. The trial judge found that some cases had allowed such testimony, some cases had addressed false confession experts but not allowed or rejected their admissibility, and some cases upheld a trial court's decision that false confession expert testimony should be excluded. After reviewing all the cases, the court held that it could not "say that expert opinion in the field of coerced or false confessions is widely accepted within the scientific community."

*Edmonds*, 2006 Miss. App. LEXIS 311 at 31-5.

¶107. Having reviewed the trial court's thorough analysis in its opinion, including its conclusion, I agree with the trial court that the *Daubert* requirements were not satisfied by

60

Edmonds. The trial court provided a fourteen-page opinion discussing the evidence and testimony proffered by Edmonds's expert, Dr. Redlich, during the day-long *Daubert* hearing conducted by the trial court. Ultimately, the trial court found that Edmonds failed to satisfy the requirements of *Daubert* and concluded that Edmonds failed to meet the reliability standard. I have already set forth in this opinion the Court of Appeals' well-reasoned analysis of our legal precedent on the admissibility of an expert on false confessions and the findings of the trial court.

¶108. The Court of Appeals and the trial court had similar analyses of the admissibility of experts on false confessions which considered *McLemore*, *Daubert*, and *Kuhmo Tire*. Without reiterating the similar analysis quoted from the Court of Appeals regarding the trial court's findings, the trial court's legal conclusion is well worth citing regarding the expert testimony. The trial court reasoned as follows:

> *McLemore* requires that this Court conduct a reliability determination before allowing expert testimony in the field of false or coerced confessions. The initial *Daubert* reliability factors are: (1) the theory's testability, (2) whether it has been a subject of peer review or publication, (3) the known or potential rate of error, and (4) the degree of acceptance within the relevant scientific community. When applying these reliability factors to the proposed testimony the Court finds that the theory of coerced or false confession characteristics or traits cannot be tested according to Dr. Redlich. It has been subject to limited peer review by a very small group of researchers some of whom recognized the weakness of the current empirical foundation of their field. That it has no published rate of error at worst according to Dr. Redlich and at best, the rate or error is approximately 45% according to Paul G. Cassell. Finally, the Court finds that the area of coerced confessions is not widely accepted in the relevant scientific community nor is it widely accepted in the legal community.

In summary this Court would have to simply accept the *ipse dixit* of Dr. Redlich if it were to allow the submission of the proposed testimony to a jury. That is the evidence is reliable because I say it is reliable. "Impressions gleaned from clinical experience or individual case studies concerning the possibility of false [testimony], offers no inherent advantage over the knowledge possessed by ordinary lay people." *State v. MacDonald*, 718 A.2d at 198. The Mississippi Supreme Court has held that the focus of the required reliability analysis "must be solely on principles and methodology, not on the conclusions they generate." *McLemore*, 863 So. 2d 31, 37 (Miss. 2004) (quoting *Daubert*, 509 U.S. 595, 113 S. Ct.2786). In the case at bar the evidence proffered by the Defendant of coerced confessions does not rest on sufficient methodology and principles to support its admissibility under *McLemore*, *Daubert*, *Kumho* and M.R.E. 702. "This is not 'voodoo science' but is not yet ready for 'prime time' either. The false confession theory needs further study and refinement. Consequently, the admission of expert testimony based on this new theory is premature and unreliable. Currently, the empirical base that supports the theory has too many unanswered questions, no known error rate, and just one laboratory experiment to back it up. This foundation cannot support reliable conclusions just yet." *Vent*, 67 P.3d at 670 (quoting Major James R. Agar, II, *The Admissibility of False Confession Expert Testimony*, 1999 Army Laws 26, 42-43 (1999)). This Court finds that Edmonds has failed to meet the burden of reliability established by *McLemore*, *Daubert*, and *Kumho Tire* and therefore, the testimony of Dr. Allison Redlich will be excluded.

¶109. The Court of Appeals provided an extensive and in-depth overview of the trial court's findings and conducted its own commendable analysis on the false-confession issue. Based upon our legal precedent, the Court of Appeals did not err by affirming the trial court's denial of Dr. Redlich's expert testimony on false confessions. Likewise, the Court of Appeals did not err by finding that the trial court did not abuse its discretion in refusing the expert testimony.

**II.    Dr. Steven Hayne**

¶110. In Edmonds's videotaped confession, he said, "she [Kristi Edmonds] put her hand on the trigger and I put my hand on the trigger and she kind of squeezed my trig-my [sic] hand because we didn't think it'd work." Dr. Hayne, the State's forensic pathologist, was called to testify as to Joey Fulgham's cause of death. The State offered Dr. Hayne as an expert in the field of forensic pathology, and the defense had no objection. The trial court accepted Dr. Hayne "in the field of forensic pathology as an expert" and "to give expert opinions regarding matters in that field."

¶111. The State questioned Dr. Hayne regarding his examination of Fulgham's body, photographs, video of the crime scene, and the location where the body was found. Dr. Hayne was asked if Edmonds's version of what happened was consistent with what he discovered. Specifically, the State asked Dr. Hayne, "Based on the path of the projectile and everything that you viewed, do you have an opinion as to whether or not the defendant's version of the events is consistent with what you found in Mr. Fulgham?" The defense objected under **Daubert** that this was outside Dr. Hayne's area of expertise. The trial court conducted a hearing outside of the jury's presence. The trial court determined that pursuant to this Court's holding in **Holland v. State**, 705 So. 2d 307, 341 (Miss. 1997), Dr. Hayne could provide an opinion about whether the defendant's version of the events and the evidence as found on the victim were consistent with his findings within a reasonable degree of medical certainty. Dr. Hayne testified that "within a reasonable medical certainty, it's consistent with the scenario provided to me and would be in compliance with the facts that I saw."

¶112. The Court of Appeals held:

As can be seen from the quoted passages, the State did not ask Dr. Hayne whether his autopsical findings were consistent with two people pulling the trigger. Moreover, Dr. Hayne did not testify to such a finding. The precise question asked by the State that drew the objection was this:

> Based on the path of the projectile and everything that you viewed, do you have an opinion as to whether or not the defendant's version of the events is consistent with what you found in Mr. Fulgham?

Because of the intervening objection, this question was not answered. After the objection was overruled, the State then asked this question:

> Doctor, I had asked you regarding your examination of the victim, Joseph Fulgham, your examination of the photographs, the crime scene video, the location that Mr. Fulgham was found, and this defendant's version of what happened and how he was killed, based on a medical degree of certainty or within a medical degree of certainty, do you have an opinion one way or another whether or not that is consistent?

Obviously, Dr. Hayne was competent to testify regarding the path of the projectile from the point it entered Joey's body. Because the autopsy provided Dr. Hayne with knowledge of the angle that the projectile traveled after entering Joey's body, Dr. Hayne also was competent to testify regarding the angle of the projectile prior to entering Joey's body, for it would have continued to travel at that angle unless it was deflected by striking a bone or some other hard object in Joey's body. There is nothing in Dr. Hayne's answer to the State's question which remotely suggests that he was opining about two people pulling the trigger of the murder weapon.

*Edmonds*, 2006 Miss. App. LEXIS 311 at 46-8.

¶113. However, Dr. Hayne also testified on cross-examination that he could not exclude the possibility that only one person may have been involved. According to the record, the defense on cross-examination elicited Dr. Hayne's testimony regarding how he determined that two people were likely involved:

Q: Dr. Hayne, you testified earlier that the defendant's statement that you saw was consistent with how the gunshot wound occurred?

A: It would be consistent with the physical findings that I observed and the information provided to me by opposite side counsel.

Q; And do you understand that the evidence is that two people fired that shot?

A: That was essentially the summary of the information given to me and seen on the video.

Q: And let's suppose if one person had fired that shot, would your opinion be the same?

A: ***I could not exclude that; however, I would favor that a second party be [sic] involved in that positioning of the weapon.***

Q: And what would be the distance of the shot?

A: The distance?

Q: Based on the fact that if one person had done this?

A: The distance of the shot, if you're addressing the muzzle of the weapon to the back of the head, all I can tell you it's at least two to three inches away. ***If you are talking about the relative position of the weapon, then I would indicate that the weapon was placed much more towards the bed and that would be consistent with one person assisting another person to achieve that trajectory, the aiming of the weapon.*** Since it would be past the center line of the decedent's head when fired, 20 degrees past the center line of the head, so, therefore, it would be consistent with two people involved. ***I can't exclude one, but I think that would be less likely.***

(Emphasis added). The Court of Appeals held:

> [W]e find no merit in Edmonds's assertion that a ***Daubert*** hearing was required before Dr. Hayne could answer the question that drew the objection from the defense. At that time, Dr. Hayne had already been qualified as an expert in forensic pathology. We agree with the trial court that, under ***Holland v. State***, 705 So. 2d 307 (Miss. 1997), Dr. Hayne, as a qualified forensic pathologist, was competent to answer the question asked him by the State, without being subjected to a ***Daubert*** hearing.

***Edmonds***, 2006 Miss. App. LEXIS 311 at 51-52.

¶114. Therefore, the jury was left with the responsibility to determine whether one or two people were involved in aiming the rifle. In ***Holland***, 705 So. 2d at 341, this Court held:

65

Dr. McGarry's testimony was not rank speculation. The general standard of review for the admissibility of qualifications of an expert to testify to areas of scientific knowledge is abuse of discretion. *Hall v. State*, 611 So. 2d 915, 918 (Miss. 1992). The State demonstrated that Dr. McGarry's testimony fell within the bounds of forensic pathology by demonstrating that his expertise dealt with wounds, suffering, and the means of infliction of injury. Our caselaw, as well as that of other states, permits this type of testimony. *Simmons v. State*, 105 Miss. 48, 57, 61 So. 826, 828 (1913) (physician may testify as to effect of sexual intercourse upon child's female organs).

Discussion of pain by a forensic pathologist is admissible. Our caselaw has allowed forensic evidence to prove that a victim suffered a fatal heart attack as a result of trauma and stress induced by a beating and robbery. *Whittington v. State*, 523 So. 2d 966, 976 (Miss. [1988]), cert. denied, 488 U.S. 923, 102 L. Ed. 2d 323, 109 S. Ct. 304 (1988); *Jackson v. State*, 441 So. 2d 1382, 1383 (Miss. 1983).

*Thus, in Mississippi, a forensic pathologist may testify as to what produced the injuries in this case* and what trauma such an injury would produce. Given Dr. McGarry's qualifications in forensic pathology as well as that which the field of forensic pathology encompasses, we find that this assignment of error is without merit.

(Emphasis added).

¶115. While Dr. Hayne never definitely stated that two people pulled the trigger, his testimony was harmless error at best. Dr. Hayne testified that he could not exclude that one person was the shooter. However, Dr. Hayne testified that he favored the theory that someone helped position the weapon used to shoot Fulghman. This testimony was corroborated by Edmonds's confession that Kristi assisted him in shooting Fulgham. Therefore, I cannot agree with the majority that Dr. Hayne's testimony requires reversal.

III.    Recantation

66

¶116. The majority does not address this issue raised by Edmonds on certiorari. Therefore, I assume that the majority does not find reversible error here. However, since it was raised on certiorari, I will briefly address this issue. The trial court held that Edmonds's recantation constituted self-serving hearsay that could not be introduced unless he took the stand and was substantially impeached. Edmonds contends on certiorari that the trial court should have allowed the video and transcript of his recantation to be admitted once he took the stand. The relevant excerpt from the record provides:

> The Defense: We are requesting a ruling from the Court in limine that the defense will be entitled to present evidence of Mr. Edmonds' recantation and repudiation of his confession and that we will be able to do that independent of – prior to and independent of Mr. Edmonds taking the stand and that we will be able to put that in even if he doesn't take the stand. . . .

¶117. The trial court relied on this Court's holding in ***Banks v. State***, 631 So. 2d 748 (Miss. 1994), ruling:

> [Y]ou will be able to ask about his denials of that day that he gave before he gave this taped statement based on ***Swinney***; but based on ***Banks***, . . . those statements given ***four days after the fact*** are still considered self-serving hearsay. They were not elicited by questioning from [a] law enforcement officer.

¶118. In ***Banks***, this Court stated requirements to introduce a self-serving statement:

> As this Court stated in ***Davis v. State***, 230 Miss. 183, 188, 92 So. 2d 359, 361 (1957):
>
> > It is an elementary rule of law that when admissions of one on trial for the commission of a criminal offense are allowed in evidence against him, all that he said in that connection must be permitted to go to the jury either through the cross-examination

67

of the witness who testified to the admission or through witnesses produced by the accused. Moreover, the fact the declarations were made by the accused were self serving does not preclude their introduction in evidence as part of his whole statement, *if they are relevant to statements introduced by the state and were made on the same occasion* as the statements introduced by the state.

See also, ***Sanders v. State***, 237 Miss. 772, 115 So. 2d 145 (1959); M.R.E. 106. ***Banks***, 631 So. 2d at 750 (emphasis added). As in ***Davis***, Edmonds's recantation came four days after his initial confession. Therefore, the trial court did not err by precluding the self-serving hearsay as it was not made on the same occasion as the confession.

¶119. Nevertheless, the record reveals that Edmonds's recantation was presented to the jury. On cross-examination, the State had Edmonds read to the jury his letter to Sheriff Bryan in which Edmonds requested to speak to Deputy George Carrithers about the murder of Fulgham. In addition, the jury watched the May 16th videotape of Edmonds's recanted confession. This recantation was taped four days after Edmonds's initial May 12th confession. Clearly, the jury was aware of the fact that Edmonds recanted his May 12th confession by way of his May 16th recantation confession. There was no error since the recantation was placed before the jury.

## IV.  Hearsay

### A.  Danny Edmonds

¶120. Danny Edmonds, Kristi's and Tyler's father, told law enforcement that Kristi asked him for a pistol and said that she was tired of Joey beating her up and beating her kids up and

68

that Joey had several hundred thousand dollars in life insurance that would go to her if he were dead. The trial court excluded the testimony as inadmissible hearsay.

¶121. Kristi was never called to the stand to testify. Accordingly, she never invoked the Fifth Amendment against self-incrimination. "It is not enough to presume or suspicion that someone will assert his Fifth Amendment privilege against self-incrimination and refuse to testify. They **must be called to the stand and there refuse to testify before they become unavailable** due to invoking the Fifth Amendment." *Slater v. State*, 731 So. 2d 1115, 1118 (Miss. 1999) (emphasis added). The trial court also never ruled on Kristi's motion to bar the defense from calling her as a witness. Mississippi Rule of Evidence 804(b)(3) provides:

> Hearsay Exceptions. The following are not excluded by the hearsay rule **if the declarant is unavailable as a witness**:
>
> (3) **Statement Against Interest**. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

(Emphasis added.) *Therefore, in order to introduce statements against interest, the rules of evidence specifically require that the declarant be unavailable as a witness to use this hearsay testimony.* As stated clearly in the rules of evidence, in order for Danny to testify as to statements made by Kristi against her pecuniary or proprietary interest, Kristi must be declared to be unavailable as a witness. Most likely, Kristi would have invoked the Fifth Amendment when questioned as to her statements, but Kristi was never called to the stand.

69

*See* M.R.E. 804(a)(1) (witness is unavailable to testify if exempted by the court on the ground of privilege). Kristi was never called to the stand and refused to answer based on the Fifth Amendment nor was she deemed unavailable as a witness. The hearsay testimony was properly excluded.

### B.     Videotape of the Montel Williams Show

¶122. The trial court properly excluded the videotape of the Montel Williams Show. The videotape, made in 2000, was too remote in time to be admissible, and the videotape was more prejudicial than probative. *See* M.R.E. 403. The videotape of the Montel Williams Show had nothing to do with Edmonds. Edmonds did not appear on the tape. Likewise, there was no discussion on the tape that Kristi, Edmonds, or anyone else would murder Fulgham more than two and a half years later. At most, it showed that in 2000 Kristi and Fulgham did not have the happiest of marriages.

¶123. The Court of Appeals reviewed the exclusion of the videotape and properly determined that the trial court did not abuse its discretion, stating:

> Edmonds contends that the videotape was key in demonstrating the tumultuous nature of Kristi and Joey's relationship. Edmonds argues that the videotape was further proof that Kristi had the desire and motive to kill Joey. In refusing to admit the videotape, the trial court properly conducted a Mississippi Rule of Evidence 403 analysis. The court found that the videotape was unduly prejudicial and that any probative value was outweighed by the potential to confuse the issues or mislead the jury. . . . Furthermore, since the particular episode of the show aired in September 2000, we fail to find that it had significant probative value two and a half years later.

*Edmonds*, 2006 Miss. App. LEXIS 311 at 70. The videotape of the Montel Williams Show made in September 2000, more than two and half years before Fulgham's murder in May

70

2003, was too remote in time to be relevant to the crime and was properly excluded. *See* *McGilberry v. State*, 797 So. 2d 940, 942 (Miss. 2001) ("The trial judge correctly determined that the evidence McGilberry wanted to present was not admissible . . . the altercation two months previously was too remote in time to be relevant to the crime.").

¶124. The majority reverses Edmonds's conviction and sentence for the murder of Fulgham. Somehow, the majority expects us to believe that Edmonds would not have benefitted from Fulgham's death as support for why this was a fundamentally unfair trial. How can the majority speculate as to what Edmonds would receive from Fulgham's murder? If we engage in pure speculation as the majority does, we can then speculate that Edmonds may have been promised money or gifts in exchange for assisting in the murder. According to the evidence that the majority does discuss, Kristi believed that she would receive hundreds of thousands of dollars from life insurance proceeds from Fulgham's death. However, we do know from Edmonds's own confession that he thought he was helping his sister. Edmonds stated that "he loved his sister more than he loved himself." Obviously, Edmonds cared deeply for his sister and trusted her in order to have gotten mixed up in this murder with her. The majority notes that Edmonds "adored Kristi."

¶125. Murder has repercussions regardless of whether Edmonds was thirteen at the time he participated in murdering Fulgham. The evidence proves that Edmonds chose to participate in a crime which resulted in Fulgham's death. A jury held Edmonds accountable for his actions and convicted him for Fulgham's murder.

¶126. Edmonds confessed that he supplied the gun used to kill Fulgham and shot Fulgham with Kristi's assistance. Further in Edmonds's confession, he recounted that Kristi then loaded the computer and other items into the car to make it appear that there had been a robbery. After Fulgham was murdered, Edmonds left the house with Kristi, to go with her, her children, and her boyfriend to the coast where they stayed at the Beau Rivage and played on the beach. As stated above, I find that the trial court did not commit any reversible error.

¶127. Therefore, I must respectfully dissent. I would affirm the judgments of the Court of Appeals and Oktibbeha County Circuit Court.